[No. 71847-4. En Banc.]
Argued September 19, 2002. Decided January 30, 2003.

RETIRED PUBLIC EMPLOYEES COUNCIL OF WASHINGTON, ET AL., *Appellants*, v. JOHN F. CHARLES, *as Director of the Department of Retirement Systems, Respondent.*

604

606

*Donald E. Clocksin*, for appellants.

*Christine O. Gregoire, Attorney General*, and *Spencer W. Daniels, Assistant*, for respondent.

*Harriet K. Strasberg* on behalf of Washington Education Association, amicus curiae.

IRELAND, J. — Organizations representing retired public employees and teachers, as well as individual current state employees and teachers, petitioned for a writ of mandamus against the director of the Department of Retirement Systems (Director). They alleged the Director unlawfully collected employer contributions to the retirement system at the lower rate adopted by the legislature in Engrossed House Bill (EHB) 2487 (Laws of 2000, 2d Sp. Sess., ch. 1) in contravention of the statutorily required rates and methodology. The organizations and individuals appeal the trial court's decision dismissing their petition for mandamus and granting summary judgment in favor of the Director. Finding that the Public Employees Retirement System (PERS 1) and Teacher's Retirement System (TRS 1) funds are not trusts and that the Director is not considered a trustee or fiduciary of those funds, and that EHB 2487 is constitutional, we affirm the trial court's dismissal of appellants' petition for mandamus and its grant of summary judgment in favor of the Director.

## I. FACTS

A. Background of the Retirement System

This case involves a challenge to the contribution rates for two of the State's retirement plans: PERS 1 and TRS 1. Appellants, plaintiffs below, are individual retired and current state employees and teachers, as well as two organizations representing retired state employees and

teachers, the Retired Public Employees Council of Washington (RPEC) and the Washington State School Retirees' Association. PERS 1 covers public employees who became members before October 1, 1977; TRS 1 covers school teachers who became members before October 1, 1977. RCW 41.40.010(33); RCW 41.32.010(38). Both retirement systems are administered by the Department of Retirement Systems (DRS).

Under both systems, members and employers make contributions to the plan, which are then invested. Any investment earnings are redeposited in the systems. In PERS 1, members pay a contribution rate, which is fixed by statute independently of the employer contribution rate for that plan. *See* RCW 41.40.330(1). The contribution rates for employees and employers under the TRS 1 system operate in the same way as for PERS 1. *See* RCW 41.32.035, .042. Upon retirement, PERS 1 and TRS 1 provide retirement benefits to their members. Retirees of both plans no longer pay contributions to their respective systems. Retirees' benefits are not affected by the contributions that continue after retirement.[1]

Employer contribution rates are adjusted to make up the difference between the estimated amount the State must pay for present and future benefits and the sum of employee contributions and investment returns as described below.

B. The Rate Setting Process Generally

The required employer contributions are derived from a three-step process. First, an outside actuary reviews and proposes suggested contribution rates based on the following assumptions: (a) growth in system membership, (b) growth in salaries, (c) growth in inflation, and (d) invest-

---

[1] A possible exception involves additional benefits provided under chapter 41.31 RCW as "gain-sharing." PERS 1 and TRS 1 retirees are allowed a potential share in any "extraordinary" gains on the investment of pension fund assets. RCW 41.31.010 provides that the annual cost of living increase for PERS 1 and TRS 1 retirees is to be "increased by the gain-sharing increase amount, if any." If the "compound average of investment returns" over the previous four fiscal years exceeds 10 percent, then a portion of the funds in the retirement plans is multiplied by the compound average, resulting in the gain-sharing increase that will be disbursed to retirees. RCW 41.31.020(1)(b).

ment rate of return. *See* former RCW 41.45.030(2) (1995), .060(2) (2000).

Second, the Pension Funding Work Group serves to help the Pension Funding Council (PFC) in its role, including help in: (a) reviewing actuarial valuations, (b) reviewing economic assumptions, and (c) "any other purpose which may assist the [PFC]." RCW 41.45.120(3). Recommendations from affected employee and employer groups are actively sought during the "work group process." RCW 41.45.120(4). Open public meetings are to be held on those recommendations. *Id.*

Third, the PFC adopts and may change the employer contribution rates, consistent with the assumptions, every two years (even-numbered years). Former RCW 41.45-.060(2)(a)-(c). *See also* RCW 41.45.100 (creating the Pension Funding Council). The PFC notifies directors of the Office of Financial Management and DRS of the state and employer contribution rates adopted by the council. Former RCW 41.45.060(6). The Director collects the rates adopted by the council for the dates set by statute. Former RCW 41.45.060(7).

C. The Rate Setting in this Case

Based on the results of the 1997 actuarial valuation, the state actuary recommended a decrease in the employer contribution rates for the 1999-2001 biennium for both the PERS and TRS plans. The recommendation was to decrease the rates from 7.32 percent to 4.36 percent for PERS and from 11.75 percent to 8.38 percent for TRS. The PFC adopted the reduced contribution rates recommended by the state actuary. The legislature implemented those rates for the 1999-2001 biennium and scheduled the rates to expire June 30, 2001. *See* former RCW 41.45.0603(2)(a), (b) (2000); LAWS OF 1999, ch. 309, § 907(1)(a), (b). Appellants do not challenge the implementation of these rates.

In 1998, the state actuary performed another annual actuarial valuation. In April 2000, the legislature enacted EHB 2487, a supplemental budget bill for the remainder of

the 1999-2001 biennium. The bill further lowered the employer contribution rates, midbiennium. LAWS OF 2000, 2d Sp. Sess., ch. 1, § 906. For PERS, the rates were lowered an additional 0.78 percent. The TRS rates were lowered an additional 2.35 percent. *Compare* rates adopted by PFC (Clerk's Papers (CP) at 109) *with* former RCW 41-.45.0603(2)(a), (b). The stated reason for reducing the rates was that the 1998 valuation from the state actuary determined that the funding goals expressed in former RCW 41.45.010 (1998) could still be met using lower employer contribution rates, primarily because of investment returns on the pension funds that were higher than anticipated. Former RCW 41.45.0603(1). Originally, the rates adopted by the PFC were to extend from July 1, 1999 through June 30, 2001 for PERS and from September 1, 1999 through June 30, 2001 for TRS. LAWS OF 1999, ch. 309, § 907. EHB 2487 changed these effective dates, making the former contribution rates set by the PFC ineffective as of April 30, 2000, for both plans. LAWS OF 2000, 2d Sp. Sess., ch. 1, § 902. It then established that the new rates were to take effect on May 1, 2000. *Id.* at § 906. The Director began collecting the new reduced rates provided in EHB 2487 between May 1, 2000 and the end of the 1999-2001 biennium. The Director's implementation of the new rates is being challenged in this action.

## II. PROCEDURAL HISTORY

The plaintiffs (Retirees and Employees) filed their petition for a writ of mandamus against a state officer in October 2000 seeking jurisdiction in this court. The petition was transferred to the Thurston County Superior Court. The trial court dismissed the petition, denied the Retirees' and Employees' motion for summary judgment, and granted the State's cross motion for summary judgment. This court accepted direct review.

## III. ISSUES

Should the Director of the Department of Retirement Systems collect the employer contribution rates originally set for the 1999-2001 biennium or collect the reduced rates set by the legislature midbiennium?

Before deciding the above question, this court must determine the following preliminary issues:

1. Whether former RCW 41.45.050(3) (1998) confers standing to members of the retirement systems independently of standing as a beneficially interested party under the mandamus statute.

2. Whether the PERS 1 and TRS 1 are properly characterized as trusts.

3. Whether the Director of the Department of Retirement Systems is a trustee of the retirement funds or a fiduciary to the members and retirees of the systems.

4. Whether the appropriations bill, Engrossed House Bill 2487, violates article I, section 23 or article II, sections 19 and 37 of the Washington Constitution.

## IV. ANALYSIS

A. Standard of Review

■■ When reviewing an order of summary judgment, the appellate court engages in the same inquiry as the trial court. *Bowles v. Dep't of Ret. Sys.*, 121 Wn.2d 52, 62, 847 P.2d 440 (1993). The appellate court determines whether genuine issues of material fact exist and whether the moving party is entitled to judgment as a matter of law. *Id.*; CR 56(c). The court considers the facts in the light most favorable to the nonmoving party. *Bowles*, 121 Wn.2d at 62. The nonmoving party may not rely on speculation, argumentative assertions that unresolved factual issues remain, or on having its affidavits considered at face value. *Seven Gables Corp. v. MGM/UA Entm't Co.*, 106 Wn.2d 1,

13, 721 P.2d 1 (1986). The court should grant the motion only if reasonable persons could reach but one conclusion. *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982).

B. Additional Evidence on Review

RAP 9.11 allows an appellate court to take additional evidence on review if:

> (1) additional proof of facts is needed to fairly resolve the issues on review, (2) the additional evidence would probably change the decision being reviewed, (3) it is equitable to excuse a party's failure to present the evidence to the trial court, (4) the remedy available to a party through postjudgment motions in the trial court is inadequate or unnecessarily expensive, (5) the appellate court remedy of granting a new trial is inadequate or unnecessarily expensive, and (6) it would be inequitable to decide the case solely on the evidence already taken in the trial court.

RAP 9.11(a). The Director has moved this court to accept the affidavit of the state actuary, which explains that the criteria for a gain-sharing increase in pension benefits would not have been met despite the lowered contribution rates. This information was unavailable for the trial court because the final information for the investment returns for fiscal year 2001 was not available. Aff. of Gerald Allard (Mar. 11, 2002).

█ While the information in the affidavit is illustrative, Retirees' and Employees' standing in this case, under either the mandamus standard or the more relaxed public interest standard, is not wholly tied to whether their concern for decreased gain-sharing is realistic or not. For this reason, the additional evidence would not change the decision of whether to grant Retirees and Employees standing in this case. The Director's motion to receive additional evidence on review is denied. The standing issue is discussed further, below.

C. Mandamus—Chapter 7.16 RCW

A court may grant a writ of mandamus to "compel the performance of an act which the law especially enjoins as a

duty resulting from an office . . . ." RCW 7.16.160. A writ is appropriately issued in cases where there is not a "plain, speedy and adequate remedy in the ordinary course of law," upon affidavit of a beneficially interested party. RCW 7.16.170.

D. Preliminary Issues

1. Standing

■ ■ Former RCW 41.45.050(3) provides that "[a]ny member of an affected retirement system may, by mandamus or other appropriate proceeding, require the transfer and payment of funds . . . ." The trial court concluded that this statutory section provides a right of mandamus only to compel transfer and payment, not calculation and billing. Accordingly, the trial court held that the retirees did not have standing under this section because it does not provide a right against the department for improper or inadequate billing. Retirees and Employees contend that the trial court took a "tortured interpretation" of former RCW 41.45.050(3). Br. of Appellant at 13. Appellants argue that the law provides express obligations for the proper operation of the retirement system: "the director must bill, the employers must pay and the director must collect if the proper payments are not made." *Id.* at 13-14. The process of collection requires the Director to assure that employers are contributing the correct amounts to the retirement systems and that those amounts are transferred into the retirement fund. Appellants argue that the trial court's interpretation contravenes the legislature's intent.

The Director counters that former RCW 41.45.050(3) does not provide an additional basis for standing. Members of the retirement system must, to compel transfer and payment pursuant to former RCW 41.45.050(3), still meet the requirements of a mandamus action. Subsection three reads:

> (3) The department shall bill employers . . . using the combined rates established in [former] RCW 41.45.060 and [former] 41.45.070 regardless of the level of pension funding

provided in the biennial budget. Any member of an affected retirement system may, *by mandamus or other appropriate proceeding*, require the transfer and payment of funds as directed in this section.

Former RCW 41.45.050(3) (emphasis added).

The wording of the statute is clear in that it allows members to compel the Director's action through mandamus. The mandamus statute is provided in chapter 7.16 RCW. The court should read the sections of two statutes relating to the same subject matter together to ascertain legislative purpose and to maintain the integrity of both statutes. *Beach v. Bd. of Adjustment*, 73 Wn.2d 343, 346, 438 P.2d 617 (1968). Former RCW 41.45.050(3) provides members with an opportunity to compel the transfer and payment of retirement funds if they qualify for a writ of mandamus. The Director is correct that the test for standing in this case is provided in chapter 7.16 RCW and former RCW 41.45.050(3) merely clarifies that members must use a mandamus proceeding to compel transfer and payment.

a. Nature of Pension Rights

This court has held that members and retirees of retirement systems have certain pension rights that are contractual in nature. *Bakenhus v. City of Seattle*, 48 Wn.2d 695, 701, 296 P.2d 536 (1956). It has been held that retirees have vested contractual pension rights to "a retirement system actuarially designed through systematic funding to meet present and future pension liabilities." *Weaver v. Evans*, 80 Wn.2d 461, 478, 495 P.2d 639 (1972). These rights will be discussed more fully later in this opinion. It appears that the Director is arguing that, while pension rights may be contractual in nature, none is infringed upon by EHB 2487. Thus, he contends that Retirees and Employees are not automatically granted standing by virtue of their contract rights and are not, in turn, beneficially interested on any other grounds. Retirees and Employees maintain that they have certain pension rights that are contractual in nature and they are thereby beneficially interested in any changes in the funding system that may infringe upon those rights.

b. Beneficially Interested

■ The parties disagree as to whether the Retirees and Employees are beneficially interested. An individual has standing to bring an action for mandamus, and is therefore considered to be beneficially interested, if he has an interest in the action beyond that shared in common with other citizens. *State ex rel. Lay v. Simpson*, 173 Wash. 512, 512-13, 23 P.2d 886 (1933).

The Director asserts that the Retirees and Employees are not beneficially interested in the contribution rates charged to PERS and TRS employers since employer contribution rates do not increase employee contributions, nor do they affect the present or future benefits received by retirees. Moreover, retirees no longer pay any contributions. It is true that in the PERS 1 and TRS 1 plans, members pay a fixed contribution rate that does not relate to the employer contribution rates for those plans. The Director points out that PERS 1 and TRS 1 are defined benefit plans, which means that benefits are not proportional to the employee contributions and that employer contributions must be set at whatever amount is necessary to fund the benefits defined in the statute. *See Bowles*, 121 Wn.2d at 71; *see also Koster v. City of Davenport*, 183 F.3d 762, 767 (8th Cir. 1999) ("[A] defined benefit plan entitles the members to a predetermined distribution upon retirement and to an actuarially sound plan to ensure that the plan is adequately funded to meet those distribution requirements. It does not entitle them to any use of the contributions other than to ensure the above entitlements are met."). The Director further contends that Retirees and Employees have failed to show that the system was made actuarially unsound by EHB 2487 or that they were adversely affected by the lowered contribution rates.

The Retirees and Employees argue that they are beneficially interested because they have a vested interest in the process for funding pensions. Specifically, they claim they have interests in seeing (1) there is enough money in the retirement system to pay their benefits, (2) that the existing

unfunded pension liability is paid off, and (3) that sufficient assets are available to provide benefit increases without imposing the burden of those increases on taxpayers. *See generally* former RCW 41.45.010(1), (2), (4) (1998) (providing the legislature's intent with regard to funding the retirement systems). They argue that EHB 2487 risks violating the legislature's goals for the funding of the system. Retirees and Employees argued to the trial court that they need not show that the lowered rates render the retirement system actuarially unsound. They would require the Director to follow the unamended statutory process to determine whether or not the lowered contribution rates will render the system actuarially unsound.

Retirees and Employees rely on *Weaver*. In *Weaver*, this court issued a writ of mandamus where the governor had reduced the funds appropriated for TRS to a point where the general fund, from which retirement benefits are to be paid, would be insufficiently funded to honor retirement benefits due and payable for the remainder of the biennium. *Weaver*, 80 Wn.2d at 478. Retirees and Employees note that the dissent in that case believed that appellants had not shown that the governor's action rendered the system actuarially unsound, but perceive that the majority of the court did not think it necessary to demonstrate unsoundness. *Id.* at 479-80 (Neill, J., dissenting). The dissent noted that there were more than enough funds in the Pension Reserve Fund to fulfill payment of the due and payable benefits. It appears that the dissenting justice believed that the system could not be actuarially unsound if there were sufficient monies in the reserve fund. *See id.* at 481 (Neill, J., dissenting). Retirees and Employees believe that under *Weaver* they are not required to show actuarial unsoundness.

As the Director argues, the governor's actions in *Weaver* resulted in a situation where the retirement system could not finance benefit payments in the manner envisioned by the legislature (i.e., payments made out of the general fund). Thus, in that case, the system was in fact actuarially

unsound in that the fund from which benefits were to be paid was overdrawn and would not be able to finance the benefits due and payable for the biennium. Moreover, the situation was such that actual pension rights in the form of benefits were implicated by the governor's action. The Director cites cases from other jurisdictions that have issued writs of mandamus only upon a showing from the plaintiff that the change to the retirement system will render the system actuarially unsound. *See Dombrowski v. City of Philadelphia*, 431 Pa. 199, 245 A.2d 238 (1968) (plaintiff was beneficially interested where actual and immediate impairment of pension rights had been adduced); *Lee v. Mun. of Bethel Park*, 156 Pa. Commw. 158, 626 A.2d 1260, 1264 (1993) (plaintiffs did not have standing where they failed to allege any adverse impact the action at issue would have on the soundness of the retirement plan).

A search of Washington cases has not revealed a definition of actuarial soundness. However, a footnote in *Dombrowski* provides: "for a public retirement system, actuarial soundness requires that the municipality contribute a sum of money each year sufficient to cover the 'normal cost' for that year plus interest on the system's 'unfunded accrued liability.' " 431 Pa. at 201 n.1 (summarizing the findings of the trial court based on expert testimony).

Since this case is before this court on direct review of a motion for summary judgment, there has been no expert testimony on whether the lowered contribution rates render the system actuarially unsound. The state actuary has attested by affidavit that his office has long performed annual actuarial valuations of the four main public retirement systems, two of which are PERS and TRS. The results of these annual valuations are available to the public and provide information to both the public and legislature regarding the overall funding and financial status of the retirement systems. These annual valuations are done according to the same statutorily prescribed methods as the biennial valuations. The state actuary explained that "[s]everal factors may cause contribution rates to change,

including investment return, number of members terminating employment, salary increases, number of retirements, growth of membership, and benefit increases enacted by the legislature." CP at 778-79. The PFC adopted the rates calculated in the 1997 actuarial valuation for the 1999-2001 biennium. In 1998, as is customary, another actuarial valuation was performed using the same actuarial process as the 1997 valuation, except that 1998 figures rather than 1997 figures were substituted for variables such as membership and value of assets. The contribution rates resulting from this 1998 valuation were those that were incorporated into EHB 2487. The state actuary concluded:

> "[w]hile the rates in the 1998 valuation were not calculated for the purpose of replacing the rates that had been adopted by the Pension Funding Council, the rates were calculated on the same basis as the earlier rates and do represent amounts needed to fund the retirement systems, taking into account the changes that have occurred since the 1997 valuation. No reason exists which would make using the rates in the 1998 valuation improper, from an actuarial standpoint."

CP at 780 (Feb. 16, 2001 Aff.).

Retirees and Employees offer the opinion of Ira Summer[2] who opines that the funding objectives in former chapter 41.45 RCW of benefit security, contribution consistency, and benefit improvement are not met by setting rates based on interim valuation results. Summer explains that benefit security may be harmed by lowered contribution rates because of the potential for lower investment earnings on those contribution rates. Early changes in contribution rates hinder an employer's ability to budget its contributions. Accordingly, the midbiennium change brings the system's stability and predictability into question. Summer further asserts that the interim valuation undermines investment policy by reducing the amount of money into the

---

[2] Summer's extensive qualifications include serving as the actuary for the Minnesota Teachers' Retirement Association and the employees' retirement associations of various counties in California. He was also the auditing actuary to the California Public Employees' Retirement System. He is currently the president of Public Pension Professionals.

retirement fund that the State Investment Board uses to set its investment policy of the funds. Lastly, he believes that the practice of asset smoothing on an annual basis, rather than a biennial basis, is inconsistent with actuarial methodology.

■ Retirees and Employees couch their argument in terms of *potential* for actuarial unsoundness and contravention of the legislature's goals in enacting the pension funding statutes. The Director calls for a showing of immediate, rather than potential, actuarial unsoundness. For purposes of standing under the mandamus statute, all that must be shown is that the party has an interest in the matter beyond that of other citizens. The simplicity in this standard compels the conclusion that Retirees and Employees have an interest, beyond that of other citizens, in changes made to the retirement system. Retirees and Employees have standing in this case.

### 2. Are PERS and TRS Trusts?

Retirees and Employees contend that the PERS and TRS retirement systems are trusts and that the Director is a trustee who owes Retirees and Employees the duties of a fiduciary. They argue that each system has elements of a trust: settlor, trustee, corpus, beneficiary, and trust instrument. The trial court disagreed, without discussion, in light of two recent Court of Appeals decisions that had rejected the proposition Retirees and Employees now make. *See Retired Pub. Employees Council v. State*, 104 Wn. App. 147, 16 P.3d 65, *review denied*, 143 Wn.2d 1023 (2001); *Wash. Fed'n of State Employees v. State*, 107 Wn. App. 241, 26 P.3d 1003 (2001). Both Court of Appeals cases cite and rely upon this court's opinions in *Bowles*, and *City of Marysville v. State*, 101 Wn.2d 50, 676 P.2d 989 (1984). The trial court concluded that both *Bowles* and *Marysville* had rejected the characterization of PERS 1 as a trust. As a result, the trial court held that the Director was entitled to summary judgment on this issue.

In *Bowles*, the parties disagreed as to how DRS should calculate lump sum payments received by PERS 1 employ-

ees upon retirement for accrued vacation and sick leave. *Bowles*, 121 Wn.2d at 56. One of the issues on appeal was whether the statute of limitations had run. *Id.* at 78. Despite a recent case's unequivocal holding that a three-year statute of limitations applies to actions alleging breach of state employee pension rights, the appellants argued PERS 1 was a trust and that the three-year statute of limitations did not apply. *Id.* at 79. This court rejected the appellant's erroneous contention that PERS 1 was a trust, citing *Marysville*, where this court held that employer contributions were not held by the State as a trustee and concluded that, in light of *Marysville*, this court could not construe PERS 1 as a trust. *Id.*

In *Retired Public Employees Council v. State*, appellants from the case at bar appealed the trial court's grant of summary judgment in favor of the Director. 104 Wn. App. at 149. Retired Public Employees Council (RPEC) sought to compel the Director to pay cost of living adjustments for the years 1981 through 1995. The Director moved for summary judgment on the basis that the statute of limitations was three years and had expired. The court rejected RPEC's argument that the three-year statute of limitations for oral contracts did not apply because PERS 1 is a trust. *Id.* at 150. The Court of Appeals relied on *Bowles*, stating that this court had "expressly 'rejected a characterization of the PERS I fund as a trust.'" *Id.* at 151 (quoting *Bowles*, 121 Wn.2d at 79). RPEC also tried to distinguish *Bowles* and argue its incorrectness, but the Court of Appeals found the arguments unpersuasive. *Id.*

 Retirees and Employees rely on mid-twentieth century cases that have referred to retirement boards as trustees and stated that the retirement fund was a "special fund, of a proprietary nature." *State ex rel. State Employees' Ret. Bd. v. Yelle*, 31 Wn.2d 87, 110-13, 201 P.2d 172 (1948). *See also Naccarato v. Sullivan*, 46 Wn.2d 67, 76, 278 P.2d 641 (1955) (stating that retirement board members "are made trustees of the funds coming into their hands for the benefit of the public employees who are members of the

retirement system."). Both cases involved the investment of pension fund assets and dealt with the duties of those responsible for investing pension funds. Such is not the case here. The State Investment Board is charged with investment of the pension funds. This State's case law, recent case law in particular, has refused to characterize the retirement funds as trusts. The Director correctly distinguishes and properly limits appellants' characterization of these cases. Thus, we affirm the trial court's grant of summary judgment denying the characterization of the PERS 1 and TRS 1 funds as trusts.

3. Does the Director Owe Fiduciary Duties as a Trustee or Fiduciary?

If the funds are not trusts, then the Director may not be characterized as a trustee of those funds. Retirees and Employees argue in the alternative that the Director may nonetheless be a fiduciary. They argue that his statutory duties may be equated to fiduciary duties and that the legislature intended this result in light of its grant of a right to seek mandamus to compel transfer and payment of funds as provided in former RCW 41.45.050(3). A fiduciary relationship may be found when: (1) one party has superior knowledge, and (2) that party uses that superior knowledge to induce reliance by the party to whom a duty is owed. *Liebergesell v. Evans*, 93 Wn.2d 881, 889-91, 613 P.2d 1170 (1980). Whether a duty exists is a question of law. *Hansen v. Friend*, 118 Wn.2d 476, 479, 824 P.2d 483 (1992). No Washington cases have held that the Director of Retirement Systems is a fiduciary to members and retirees of the retirement systems. Moreover, as the Director argues, Retirees and Employees have not shown that the Director had superior knowledge of the lowered contribution rates. *See Miller v. U.S. Bank of Wash.*, 72 Wn. App. 416, 426-27, 865 P.2d 536 (1994). EHB 2487 disclosed the lowered contribution rates as adopted by the legislature. This information was readily available to Retirees and Employees. Second, there is no showing that the Director somehow indicated to Retirees and Employees that he would collect the rates

initially adopted by the PFC rather than the subsequent new rates adopted by the legislature, thereby inducing reliance on his assurances. In fact, prior to the 2000 act, the Director notified Retirees and Employees of DRS's intention to "collect contribution rates in accordance with any legislation . . . passed by the Legislature [that] becomes law." CP at 112. There is no statutory language referring to the Director as a fiduciary that would clearly illustrate any legislative intent to treat him as such. As the trial court stated, "even when the evidence and inferences are viewed in a light most favorable to [Retirees and Employees] there is the complete absence of evidence to establish [their] reliance on [the Director]." *Retired Pub. Employees Council of Wash. v. Charles*, No. 01-2-00060-5 (Thurston County Super. Ct. Aug. 20, 2001). We affirm the trial court's conclusion that, since the Director is not a trustee, nor is he a fiduciary, the attendant duties associated with these roles do not extend to him.

4. Does EHB 2487 Violate Appellants' Constitutional Rights?

a. Article I, Section 23

Were Appellants' Vested Contractual Rights Impaired?

Retirees and Employees assert they have a vested contractual right in the process by which the retirement system is funded and that this right is substantially impaired by the collection of lower employer contribution rates.

█ Preliminarily, a statute is presumed to be constitutional, and the party seeking to overcome that presumption must meet the heavy burden of proving unconstitutionality beyond a reasonable doubt. *Wash. Fed'n of State Employees v. State*, 127 Wn.2d 544, 559-60, 901 P.2d 1028 (1995).

█ Article I, section 23 of Washington's Constitution provides that no law impairing the obligations of contracts shall be passed. The prohibition against any impairment of contracts is not absolute and should not be imposed with literal exactness. *Id.* at 560-61. The State's impairment of

its own contracts is subject to more stringent review under the contract clause than impairment of contracts between private parties. *Id.* (quoting *Tyrpak v. Daniels*, 124 Wn.2d 146, 151-52, 874 P.2d 1374 (1994) (citing *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 n.15, 98 S. Ct. 2716, 57 L. Ed. 2d 727 (1978))). The three-part test to determine if there has been an impairment of a public contract is: (1) does a contractual relationship exist, (2) does the legislation substantially impair the contractual relationship, and (3) if there is substantial impairment, is it reasonable and necessary to serve a legitimate public purpose. *Tyrpak*, 124 Wn.2d at 152.

Under the first prong, we must initially determine whether a contract exists. Pension provisions are part of the compensation for services and therefore become part of the employment contract. *Bakenhus*, 48 Wn.2d at 698-99. As a consequence, at least some pension rights are contractual in nature. We must then ascertain whether the pension rights claimed by Retirees and Employees to have been impaired are in fact terms of the employment contract. Retirees and Employees cite cases that have held the following to be vested contractual rights protected from impairment: size of a pension, right to a mandatory retirement age, right to a practice of including lump sum payments in the calculation of retirement benefits, right to a refund of retirement contributions, and right to add to a pension by using accrued vacation pay. *See Bakenhus*, 48 Wn.2d at 701; *Eagan v. Spellman*, 90 Wn.2d 248, 258, 581 P.2d 1038 (1978); *Wash. Ass'n of County Officials v. Wash. Pub. Employees' Ret. Sys. Bd.*, 89 Wn.2d 729, 733, 575 P.2d 230 (1978); *Horowitz v. Dep't of Ret. Sys.*, 96 Wn.2d 468, 472-73, 635 P.2d 1078 (1981); *Wash. Fed'n of State Employees v. State*, 98 Wn.2d 677, 679, 658 P.2d 634 (1983). The Director argues the cases challenging modifications to retirement plans based on impairment of contract have impinged on the promised benefits upon retirement or involve changes having a direct monetary effect on members and retirees. The one case that does not is *Weaver v. Evans*, the facts of which have been recited above.

 The *Weaver* court, in holding that the governor's actions would result in an insufficiency of funds needed to pay promised benefits, stated that members and retirees have a vested contractual pension right "to a retirement system actuarially designed through systematic funding to meet present and future pension liabilities." *Weaver*, 80 Wn.2d at 478. Retirees and Employees take a broad view of this statement, suggesting that the collection of the rates made by the legislature in EHB 2487 contravenes their pension rights to the systematic funding of the retirement system to maintain its fiscal soundness. The Director advocates for a narrower, contextual interpretation of *Weaver*, arguing that since the governor's action in *Weaver* would have resulted in insufficient funds to pay anticipated benefits, in a sense *Weaver* also dealt with a modification to the retirement plan that posed a direct threat to benefits already promised members and retirees. Here, he argues, the lower employer contribution rates had no analogous effect on either of the plans' members or retirees. However, the *Weaver* court prefaced its finding of this vested contractual right with the acknowledgment that "the legislature [had] over a span of years indicated a deep concern with the actuarial soundness of the retirement system, and that concern . . . culminated in the express adoption of a systematic method of funding to ultimately attain the desired soundness . . . ." *Weaver*, 80 Wn.2d at 478. The same could be said about the 1989 changes to the retirement funding system establishing the current system. We therefore agree with Retirees and Employees that they do have vested contractual rights to the systematic funding of the retirement system to maintain actuarial soundness.

 The second prong requires a determination of whether the legislation substantially impairs the contractual relationship. A contract is impaired by a statute which alters its terms, imposes new conditions, or lessens its value. *Wash. Fed'n*, 127 Wn.2d at 563. Modifications must bear some material relation to the theory of a pension system and its successful operation. *Weaver*, 80 Wn.2d at

476. Retirees and Employees argue that they have contractual rights in the process of funding the retirement system, generally, and that they are harmed by the Director's failure to comply with the preamended funding statutes. They argue that lower contribution rates could reduce earnings on pension assets as well as create a reduced likelihood the plan could finance future benefit improvements. Retirees and Employees assert that the State Investment Board reports that the reduced contribution rates are contributing to a negative cash flow in the Commingled Trust Fund and that, as a result of continued negative cash flows, future asset allocations and investment policies may be impacted. They assert that retirees "will likely" receive lower gain-sharing increases and that "prematurely reducing contribution rates *will* reduce the amount paid on the pension systems' past debts . . . thereby postponing the amortization of those [debts]." Br. of Appellants at 32-33 (emphasis added).

However, there is no indication of how likely these harms are or that the lower contribution rates prevent the successful operation of the pension system. Appellant organizations wrote a letter to the executive director of the State Investment Board requesting a response as to, among other things, why the Commingled Trust Fund was experiencing a negative cash flow. The executive director's response explained that a cash flow report of March 16, 2000 pointed to "several likely factors contributing to a *projected* negative cash flow *trend*." CP at 474 (emphasis added). One of five factors was contribution rate reductions. This letter contained several qualifiers to which the executive director alerted appellant organizations. The letter cautioned to "keep in mind the cash flow report provided projected cash flow *trends*, reflecting the *net* effect of all retirement funds for a given fiscal year." *Id.* at 473 (emphasis added). Also, "[i]n preparing the report, the [State Investment Board] w[as] interested in trends and the estimated net effect, and did not have a need to quantify each factor separately or precisely." *Id.* at 474.

The letter discussed above undercuts Retirees' and Employees' argument that the system may be impacted by the lowered contribution rates. There is no showing of how much the lower contribution rates would lessen the value of the retirement system, if at all. If the Retirees' and Employees' rights are in the funding process of an actuarially and fiscally sound retirement system, then EHB 2487 cannot be said to alter the terms of the contract since there is no indication that the lowered contribution rates render the system actuarially unsound. While Retirees and Employees maintain that they need not show a likelihood of harm, to allow them to claim that their contractual rights have been substantially impaired based on their assertions alone would open the door for any future plaintiff to bring a successful suit against the Director without *any* showing that harm is even *likely* to result. Consequently, appellants have not met their burden of proof that a question of fact exists as to whether the system is actuarially unsound, i.e., the modifications made in EHB 2487 have not been shown to affect Retirees' and Employees' vested pension right. There being no evidence of substantial impairment, it is unnecessary to discuss the third prong.

 On the issue of contract impairment, the Director also argues that the legislature has plenary power to alter and amend the retirement system, subject only to the constraints of the constitution. *See Luders v. City of Spokane*, 57 Wn.2d 162, 164, 356 P.2d 331 (1960). In contrast, Retirees and Employees cite no authority for their contention that the Director should ignore the legislature's enactment of a law that is constitutional. *See Wash. Fed'n*, 127 Wn.2d at 558 (a statute is presumed constitutional). Appellants would have the pension funding process be static for the biennium. But, the funding statutes are merely pieces of legislation, not constitutional provisions, so there is no limitation on the legislature to make changes, save the constitution. The legislature may therefore amend portions of the funding process, contrary to appellants' contention. As discussed above, Retirees and Employees have not been

able to show the lowered contribution rates will hinder the retirement system such that the benefits promised them will not be payable. We affirm the trial court's decision to grant summary judgment in favor of the Director on this issue.

b. Article II, Section 19

Does the Title of EHB 2487 Embrace More Than One Subject?

i. Compliance Generally

Article II, section 19 of Washington's Constitution provides that no bill may cover more than one subject and that the subject of every bill must be expressed in the title. It thus contains two prohibitions: (1) no bill shall embrace more than one subject (single subject rule), and (2) that subject shall be expressed in the title of the bill (subject in title rule). *State ex rel. Wash. Toll Bridge Auth. v. Yelle*, 32 Wn.2d 13, 23, 200 P.2d 467 (1948). Section 19 is to be liberally construed in favor of the legislation. *Wash. Fed'n*, 127 Wn.2d at 555. This section has a dual purpose: (1) to prevent "logrolling," or pushing legislation through by attaching it to other necessary or desirable legislation, and (2) to assure that the members of the legislature and public are generally aware of what is contained in proposed new laws. *Flanders v. Morris*, 88 Wn.2d 183, 187, 558 P.2d 769 (1977). A title need not be an index to the contents of the bill, nor must it give the details contained in the bill. *Wash. Fed'n*, 127 Wn.2d at 555. Greater latitude must be given the legislature in titling appropriations bills than any other because their purpose is to allocate state funds to such a great number of state needs. *Flanders*, 88 Wn.2d at 188. A title complies if it gives notice that would lead to inquiry into the body of the act, or indicate to an inquiring mind the scope and purpose of the law. *Id.* A narrow construction of the term "subject" in section 19 has never been favored. *Wash. Fed'n*, 127 Wn.2d at 556. Any reasonable doubts are resolved in favor of constitutionality. *Id.*

The title of EHB 2487 is "An Act Relating to fiscal matters; amending RCW 41.45.060 . . . ." Laws of 2000, 2d

Sp. Sess., ch. 1. The title continues to list those sections, both codified and uncodified, that are amended. Sections 720, 902, 905, and 906 are at issue here. Section 720 adds an uncodified section reflecting the lower contribution rates based on the 1998 actuarial valuation. Section 902 amends the contribution rate effective dates provided in Laws of 1999, ch. 309, § 907. Section 905 amends former RCW 41.45.060, as well as Laws of 2000, ch. 247, § 504, such that, for the remainder of the biennium, the rates adopted by the PFC will be effective for the period designated in section 902. Section 906 adds a new section to former chapter 41.45 RCW setting the new rates for May 1, 2000 to June 30, 2001.

ii. Does EHB 2487 Include Substantive Law?

Retirees and Employees contend that appropriations bills may not amend existing law, that the sections of EHB 2487, above, are substantive law, and are thereby inappropriate for incorporation in an appropriations bill.

■■■ ■■ An appropriations bill violates section 19 if it defines rights or alters existing laws. *Serv. Employees Int'l Union, Local 6 v. Superintendent of Pub. Instruction*, 104 Wn.2d 344, 351, 705 P.2d 776 (1985). Budget bills may not contain substantive law "because a budget bill, by its nature, appropriates funds for a finite time period—two years—while substantive law establishes public policy on a more durable basis." *Wash. State Legislature v. State*, 139 Wn.2d 129, 145, 985 P.2d 353 (1999). *Washington State Legislature* provided three indicators that a part of a budget bill may be substantive law: (1) it has been treated in a separate substantive bill in the past, (2) its duration extends beyond the two-year time period of the budget, and (3) the policy defines rights or eligibility for services. *Id.* at 147. In the same case, this court refused to adopt a "categorical definition of 'substantive law' " for purposes of determining whether an appropriations bill violates the single subject rule. *Id.*

In *Flanders*, this court held that an appropriations bill that altered the eligibility requirement for receipt of public

assistance funds was substantive law and therefore violated section 19. 88 Wn.2d at 184-85, 188. In that case, there was clear evidence that there had been two prior, unsuccessful attempts to create the same limitation in eligibility. *Id.* at 186. The court concluded that this was a law "which could not pass on its own merit, under a proper title, [and] became law by being slipped into a 45-page appropriations bill." *Id.*

Here, Retirees and Employees assert that the legislature had previously rejected the same contribution rate changes. The Senate Ways and Means Committee added a new section 508 to Senate Bill 6530 providing employer contribution rates similar to those later enacted in EHB 2487 with the same effective dates. S.B. 6530, 56th Leg., Reg. Sess. (Wash. 2000). Senate Bill 6530 passed the Senate but section 508 was removed by the House. Contrary to what Retirees and Employees claim, this past treatment of the contribution rates in S.B. 6530 does not indicate prior legislative determination on the issue of lowered contribution rates for PERS 1 and TRS 1 and does not rise to the level of conclusiveness in *Flanders*. There are any number of reasons why section 508 was deleted from S.B. 6530. Retirees and Employees have failed to show beyond a reasonable doubt that sections 720, 902, 905, and 906 contain substantive law that was incapable of passing on its own merits.

The second indicator is that the section of the budget bill extends beyond the two-year time period of the budget. Retirees and Employees contend that the lowering of the contribution rates "will *likely* impact the retirement system far beyond the end of the biennium." Br. of Appellants at 40 (emphasis added). They again recite the speculative harms that may come to the retirement system as a result of the lowered contribution rates that they relied on earlier. The Director aptly corrects the Retirees' and Employees' focus: in addition to the asserted "impacts" being speculative and unproven, the appropriate inquiry is whether the changes extend beyond the two-year time period of the budget, not whether there may be "impacts" beyond the budget period.

The third indicator is that the bill defines rights or eligibility for services. Retirees and Employees reiterate their opinion that they have pension rights in the nature of a "non-political rate-setting process with peer review, independent expertise, mandatory interest group involvement, and proper advance notice." Br. of Appellants at 40. They contend that EHB 2487 changes the rate-setting process, the systematic method of funding discussed in *Weaver*, and is therefore substantive legislation. As discussed above, a more reasonable reading of *Weaver* is that it recognized vested pension rights "to a retirement system actuarially designed through systematic funding to meet present and future pension liabilities." *Weaver*, 80 Wn.2d at 478. Retirees and Employees therefore do not have specific pension rights in the physical system and individual statutes in effect when they began work. Rather, their right is to a system that will fulfill the State's promise to meet present and future pension liabilities.

█ While this list of indicia of substantiveness is not exhaustive, Retirees and Employees offer no other bases to conclude the changes in EHB 2487 are substantive in nature. We conclude that the title does not violate article II, section 19.

c. Article II, Section 37

Does EHB 2487 Revise or Amend the Pension Funding Statutes by Mere Reference in its Title?

█ Article II, section 37 of Washington's Constitution provides that "[n]o act shall ever be revised or amended by mere reference to its title, but the act revised or the section amended shall be set forth at full length." Section 37 is designed to protect the legislature and public from fraud and deception; "not to trammel or hamper the legislature in the enactment of laws." *Spokane Grain & Fuel Co. v. Lyttaker*, 59 Wash. 76, 82, 109 P. 316 (1910).

█ An act is exempt from section 37 requirements if the act is complete, independent of prior acts, and stands alone on the particular subject of which it treats. *Amalgam-*

*ated Transit Union Local 587 v. State*, 142 Wn.2d 183, 246, 11 P.3d 762 (2000). An act is amendatory, rather than complete, if it changes the scope or effect of a prior statute, *State ex rel. Arnold v. Mitchell*, 55 Wash. 513, 518, 104 P. 791 (1909), although nearly every piece of general legislation will modify a prior statute to a certain extent, either directly or indirectly. *Holzman v. City of Spokane*, 91 Wash. 418, 426, 157 P. 1086 (1916). This alone, however, does not inescapably lead to a violation of section 37. *Id.*

There is a two-part test for violation of section 37: (1) the court must determine whether the bill is such a complete act that the scope of the rights created or affected by the bill can be ascertained without referring to any other statute or enactment; and (2) whether a determination of the scope of the rights under the existing statutes would be made erroneous by the bill. *Wash. Educ. Ass'n v. State*, 97 Wn.2d 899, 903, 652 P.2d 1347 (1982) (quoting *Wash. Educ. Ass'n v. State*, 93 Wn.2d 37, 40-41, 604 P.2d 950 (1980) (citing *Naccarato v. Sullivan*, 46 Wn.2d 67, 74, 278 P.2d 641 (1955); *Weyerhaeuser Co. v. King County*, 91 Wn.2d 721, 731, 592 P.2d 1108 (1979))). The *Amalgamated* court has cautioned, however, that "[a] later enactment which is a complete act may very well change prior acts and [yet still be] exempt from the requirement of article II, section 37." *Amalgamated*, 142 Wn.2d at 251-52. This court continued, "[section 37] does not apply in all cases where a new act in effect, amends another[.] [W]here the new law is independent, and no further search is required to know the law which the new act covers, the new act does not come within [section 37]." *Id.* at 252. The question in the second prong cannot be answered in isolation because complete acts may well result in a reader of an existing statute being unaware there is new law on the subject. *Id.* at 253. It is therefore not enough to ask whether one reading an existing statute would be unaware that a new enactment changes it. *Id.*

The Director points to the clarifications of the section 37 test set forth by this court in *Amalgamated*, contending that sections 902 and 906 of EHB 2487, changing the

effective dates and contribution rates, are complete in themselves and do not violate section 37. EHB 2487 clearly states its effect on the contribution rates and the differences in the effective periods for the rates adopted by the PFC and those adopted by the legislature are "readily ascertained by referring to sequential sections of [EHB 2487]." Br. of Resp't at 49. He asserts that the act explained that the reason for lowering the contribution rates was that the more current actuarial valuation showed the State could meet the funding goals of former chapter 41.45 RCW with lower employer contribution rates. The Director argues that "[n]o legislator or interested citizen reading the act could reasonably have been misled as to [EHB 2487's] impact on the existing sections of [former] RCW 41.45." *Id.* He points out that anyone referencing former RCW 41-.45.060 would see that the legislature had modified the initial effective period of the rates adopted by the PFC, and that one must reference EHB 2487 for the new effective period.

Conversely, Retirees and Employees argue that a person reading EHB 2487 cannot ascertain how the act has altered the authority of the PFC, the Director's duties, or the members' pension rights. First, Retirees and Employees contend that sections 720 and 906(1) remove the authority of the PFC to set contribution rates without setting out the former provisions in full. The former statutory provisions they claim to be altered by sections 720 and 906(1) are former RCW 41.45.060(2) and .100(2). However, section 906(1) is clear it is adding a new section to former chapter 41.45 RCW. Moreover, a legislator or citizen referencing former RCW 41.45.060(2) would be directed to Laws of 2000, 2d Sp. Sess., ch. 1, § 902, which in turn reports the changed effective periods.

Second, Retirees and Employees contend that section 906(7) suspends the statutes providing a 30-day notice of contribution changes without setting forth the previous sections, former RCW 41.26.450 (1996) and former RCW 41.40.650 (1989), in full. This suspension, however, does not

aim to confuse legislators or interested citizens. The statutory provisions are clearly referenced in section 906(7).

Finally, Retirees and Employees assert that section 905 sets out former RCW 41.45.060 in full but does not show any changes to the Director's responsibility to collect those rates adopted by the council in former RCW 41.45.060(7). This contention relies on the argument previously raised by Retirees and Employees that the Director should ignore the rates adopted by the legislature in EHB 2487 in favor of the prior rates adopted by the PFC. As discussed above, appellants cite no authority for the proposition that the Director is authorized to disregard changes adopted by the legislature that are presumed to be constitutional. Moreover, the only rates in effect for the Director to implement were the new rates established by EHB 2487. This point is discussed further, below.

■■■ The changes in EHB 2487 are clear and do not contravene the purpose of section 37, i.e., to protect against the fraud and deceit of legislators. While the trial court did not discuss this issue, we conclude, as a matter of law, that EHB 2487 does not violate article II, section 37.

E. Should the Director Collect the Rates Originally Set for the 1999-2001 Biennium or the Reduced Rates, Changed Midbiennium?

Retirees and Employees point to former RCW 41-.45.050(3), which specifies that the Director "shall bill employers . . . using the combined rates established in RCW 41.45.060 and [.070] regardless of the level of pension funding provided in the biennial budget." They also rely on former RCW 41.45.060(7), providing that the director "shall collect those rates adopted by the council." They argue that these sections require the Director to disregard the lower contribution rates adopted by the legislature in EHB 2487 because they were not the rates adopted by the council.

Appellants' assertions point to a latent conflict between sections of the pension funding statutes—former RCW 41.45.060(7) and .050(3)—and the legislature's ability to

amend legislation. On the one hand, the statutes instruct the Director to collect the rates adopted by the PFC regardless of the funding in the biennial budget. On the other, the effectiveness dates for the PFC-adopted rates and the rates themselves are reported in a piece of legislation, which the legislature may amend, alter, or repeal as it chooses, subject only to the constitution.

Here, the legislature sunsetted the effectiveness dates for the PFC-adopted employer contribution rates, midbiennium. The PFC rates were to extend from July 1, 1999 through June 30, 2001 for PERS and from September 1, 1999 through June 30, 2001 for TRS. EHB 2487 changed these effectiveness dates, making the PFC rates ineffective as of April 30, 2000, for both plans. It then established that the new rates were to take effect on May 1, 2000. Thus, the only rates for the Director to implement for the remainder of the biennium were those set by EHB 2487. As we already determined, EHB 2487 is constitutional and the funding statutes are simply legislation. As such, the legislature may amend them at will. Moreover, the Director is not authorized to disregard proper legislation and Retirees and Employees do not cite any authority to the contrary. We must conclude that the Director was under a duty to collect the only rates in existence, the new rates, for the remainder of the biennium.

## V. CONCLUSION

The legislature provided members of the retirement systems with a right to seek mandamus to compel the transfer and payment of funds. Former RCW 41.45.050(3). This section does not grant members standing in and of itself. Rather, members seeking to compel the transfer and payment of funds must independently qualify as beneficially interested parties to acquire standing and compel action by writ of mandamus. Given the contractual nature of their pension rights and their interest in the administration of the retirement system, generally, Retirees and

Employees may be considered "beneficially interested" as required by the mandamus statute and, thus, have standing to seek a writ of mandamus to compel the transfer and payment of funds. Ch. 7.16 RCW.

Washington courts have repeatedly refused to characterize PERS 1 and TRS 1 as trusts and have similarly refused to characterize the Director as a trustee outside the context of cases challenging the investment of retirement funds. Investment of retirement funds is not at issue in this case. Relying on such precedent, we hold that PERS 1 and TRS 1 are not trusts and, accordingly, decline to hold the Director to fiduciary and trustee obligations.

The Retirees and Employees failed to show, beyond a reasonable doubt, that EHB 2487 violates article I, section 23 or article II, sections 19 and 37 of the state constitution. The Director's implementation of the lowered contribution rates adopted by the legislature in EHB 2487, midbiennium, was appropriate. Accordingly, we deny appellants' request for a writ of mandamus to compel the Director to collect employer contributions to the PERS and TRS retirement plans at the rates adopted by the PFC. The trial court's grant of summary judgment in favor of the Director is affirmed.

ALEXANDER, C.J., JOHNSON, MADSEN, SANDERS, BRIDGE, CHAMBERS, and OWENS, JJ., and SMITH, J. PRO TEM., concur.