[No. 31006-6-II.   Division Two.   January 4, 2005.]

PROPERTIES FOUR, INC., *Appellant*, v. THE STATE OF WASHINGTON, *Respondent*.

*Thomas H. Grimm* and *John F. Sullivan* (of *Inslee, Best, Doezie & Ryder, P.S.*), for appellant.

*Christine O. Gregoire, Attorney General*, and *Sara J. Finley* and *Mary E. Combo, Senior Counsel*, for respondent.

¶1 ARMSTRONG, J. — Properties Four, Inc., (Properties) appeals a summary judgment dismissal of its action against

the State for damages Properties allegedly sustained when the State failed to complete a property purchase. The trial judge ruled that the State was not obligated to complete the purchase because certain statutory and constitutional conditions had not been met. The trial court also ruled that if the Department of General Administration agreed to purchase the property without such approvals and appropriations, the agreement was ultra vires and void. We find no error and, thus, affirm.

## FACTS

### I. Background

¶2 In 1994, Properties purchased a 480-acre tract in the Hawks Prairie area of Thurston County. The State was interested in purchasing 160 acres of the property for a Lacey Light Industrial Park.

¶3 Al C. Morgan, a Facilities Planning Manager for the Department of General Administration (GA), started talking with Thomas R. Hazelrigg, a Properties representative, about the property. According to Grant Fredricks, Deputy Director of GA, Morgan had signature authority to execute real estate options and purchase and sale agreements, "provided the documents and their execution otherwise complied with state law." Clerk's Papers (CP) at 99. But "Morgan only had authority to execute real estate documents consistent with applicable constitutional, statutory and regulatory provisions." CP at 99.

¶4 On February 10, 1995, Morgan and Hazelrigg signed an "Option to Purchase Agreement." CP at 56-63. Attached to the Option was "Exhibit C," entitled "Purchase and Sale Agreement," which Morgan and Hazelrigg also signed before a notary. CP at 64.

### II. Terms

¶5 The Option Agreement states: "Optionee [GA] has requested that Optionor enter into an approximate one-

year option agreement to provide Optionee with time to acquire necessary approvals and funding allotment from the Washington State Legislature in [its] 1995 Regular Session (the "Legislation") which shall commence on or about mid-January, 1995." CP at 56. In addition, the Option Agreement incorporates the Purchase and Sale Agreement, stating that "[i]n the event the Optionee exercises the Option, Optionee shall acquire the Property pursuant to the terms and conditions of this Agreement and the Purchase and Sale Agreement attached hereto as Exhibit C and by this reference incorporated herein." CP at 57.

¶6 The Purchase and Sale Agreement conditions the purchase as follows: "If the approval of any governmental agency is required for the sale of the Property, it is understood and agreed that this Agreement is subject to obtaining such approval. Purchaser shall, at Purchaser's expense, use its best efforts and take all steps necessary to obtain such governmental approval." CP at 69.

¶7 According to the Option Agreement, the closing date for the purchase of the property "shall be two weeks after [the State] provides written notice of its exercise of the Option, but in no event later than July 31, 1995." CP at 58. The Purchase and Sale Agreement shared the same closing date. The purchase price stated on both documents was $9,757,440.

### III. Extensions

¶8 Shortly before the Option's closing date (July 31, 1995), Morgan told Hazelrigg that the transaction would not close on time because the legislature had not approved the budget item. Morgan asked Properties to extend the closing date from July 31, 1995, to June 30, 1996. Morgan signed and sent Hazelrigg two letters dated September 7, 1995, one regarding the Option to Purchase Agreement and one regarding the Purchase and Sale Agreement, memorializing their oral agreement. Hazelrigg signed and returned these letters. In June 1996, Morgan asked for another

extension—this time solely regarding the Option to Purchase.

## IV. Governmental and Legislative Approval

¶9 In his declaration, Hazelrigg states that between spring of 1994 and early 1995, Morgan assured him that the Option to Purchase Agreement "had been put in the Legislature's Capitol Budget for the upcoming year" and that, in any event, the State had adequate alternative resources to fund the purchase. CP at 167. According to Hazelrigg, Morgan also told him that the State was "going ahead" with the project. CP at 167. In addition, Hazelrigg states that because they had a Purchase and Sale Agreement, as opposed to a mere Option, Properties kept the property off the market, even though there had been many delays in the dealings with Morgan.

¶10 Morgan retired in August 1996 and died a short time later.

¶11 Between February 1995 and June 1996, Fredricks several times assured Hazelrigg that there would be no problem in obtaining the legislative appropriation because the property was a good deal for the State. But Fredricks never told Hazelrigg that the legislature had approved the purchase.

¶12 Fredricks explains that although GA used its best efforts to obtain legislative approval and funding, neither the legislature, the Office of Financial Management, nor the State Capitol Committee ever approved the purchase. In 1994, the State Capitol Committee granted GA authority to pursue a no-cost option. And in 1995, when the legislature did not grant GA's request for funds to purchase the property, Fredricks informed Hazelrigg. According to Fredericks, GA rejected any other financing options.

## ANALYSIS

### I. Standard of Review

¶13 We review a summary judgment order de novo. *Retired Pub. Employees Council of Wash. v. Charles*, 148 Wn.2d 602, 612, 62 P.3d 470 (2003). Summary judgment is appropriate only if the pleadings, affidavits, depositions, and admissions on file demonstrate the absence of any genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. CR 56(c); *see Charles*, 148 Wn.2d at 612. The court must consider all facts submitted and all reasonable inferences from them in the light most favorable to the nonmoving party. *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982) (citations omitted). Here the parties do not dispute what documents they signed. Thus, we address only the legal question of whether the State is bound by the documents even though certain statutory and constitutional conditions were never met.

### II. Statutory and Constitutional Provisions for Acquisition of Property

¶14 We construe a statute de novo. *Waste Mgmt. of Seattle, Inc. v. Utils. & Transp. Comm'n*, 123 Wn.2d 621, 627, 869 P.2d 1034 (1994). If a statute is unambiguous, we derive its meaning from the statutory language alone. *Cherry v. Mun. of Metro. Seattle*, 116 Wn.2d 794, 799, 808 P.2d 746 (1991); *In re Eaton*, 110 Wn.2d 892, 898, 757 P.2d 961 (1988); *Everett Concrete Prods., Inc. v. Dep't of Labor & Indus.*, 109 Wn.2d 819, 822, 748 P.2d 1112 (1988). We employ the same tools in construing a constitutional provision. *State ex rel. O'Connell v. Port of Seattle*, 65 Wn.2d 801, 806, 399 P.2d 623 (1965); *see also State ex rel. Evans v. Bhd. of Friends*, 41 Wn.2d 133, 145, 247 P.2d 787 (1952) (stating it is a "cardinal principle of judicial review and interpretation that unambiguous statutes and constitu-

tional provisions are not subject to interpretation and construction").

¶15 Properties argues that article VIII, section 4 of the constitution and RCW 43.88.130 do not require legislative approval and a dedicated appropriation for every state contract. Properties also asserts that the lower court erred in construing RCW 43.82.010 to require legislative approval or appropriation as conditions of state property purchase. Finally, Properties contends that the trial court erred in ruling that the Purchase and Sale Agreement was ultra vires and void because it did not contain contingencies as to legislative approval or appropriation, approval by the State Capitol Committee, or approval by the Office of Financial Management.

A. Approval or Appropriation by the Legislature

■ ¶16 Washington State Constitution, article VIII, section 4 and RCW 43.88.130 are clear and unambiguous. State agencies may not incur liabilities or expend funds in excess of allotted appropriations for a particular purpose. *See* 1976 LETTER OP. ATT'Y GEN. No. 32, 1976 WL 168453. Specifically the Constitution states:

*No moneys shall ever be paid out of the treasury of this state*, or *any of its funds*, or *any of the funds under its management, except in pursuance of an appropriation by law*; nor unless such payment be made within one calendar month after the end of the next ensuing fiscal biennium, and every such law making a new appropriation, or continuing or reviving an appropriation, *shall distinctly specify the sum appropriated, and the object to which it is to be applied, and it shall not be sufficient for such law to refer to any other law to fix such sum*.

WASH. CONST., art. VIII, § 4 (emphasis added).

¶17 Consistent with article VIII, section 4, RCW 43-.88.130 limits State spending to appropriated amounts:

No agency shall expend or contract to expend any money or incur any liability in excess of the amounts appropriated for that purpose: PROVIDED, That nothing in this section shall

prevent the making of contracts or the spending of money for capital improvements . . . when such contract is permitted by law. Any contract made in violation of this section shall be null and void.

RCW 43.88.130; *see also* 1976 LETTER OP. ATT'Y GEN. No. 32, 1976 WL 168453.

¶18 GA asserts that the legislature never allocated any money toward the Lacey Light Industrial Park. Properties does not dispute this. If GA had spent state money on the project without an appropriation, it would have violated RCW 43.88.130 and article VIII, section 4 of the Constitution.

¶19 But Properties likens this case to *Carlstrom v. State*, 103 Wn.2d 391, 392, 694 P.2d 1 (1985), in which a teachers' union brought an action against the State after the legislature cancelled contractual salary increases. In *Carlstrom*, the court ruled that this cancellation was unreasonable and constituted an unconstitutional impairment of a previously valid contract under the contracts clause in the Washington and United States Constitutions. *Carlstrom*, 103 Wn.2d at 396-97. In sum, *Carlstrom* dealt with a valid contract the legislature refused to fund. In this case, GA never had legislative authority or appropriations to bind the State to the purchase. Therefore, the legislature did not render a valid agreement void; the agreements were unenforceable without the necessary agency approval and legislative funding. *See infra* sections B & C.

B. Approval by Office of Financial Management

¶20 The Office of Financial Management must review all major capital construction projects valued over $5,000,000. RCW 43.88.110(6).[1] And "[n]o expenditure may be incurred or obligation entered into for . . . *land acquisition*, site development, predesign, design, construction, and equipment

---

[1] The parties use the current statute. In 1994, RCW 43.88.110(6) appeared at subsection (5). In 1995, RCW 43.88.110(7) appeared at subsection (6). LAWS OF 1994, ch. 219, § 5; LAWS OF 1997, ch. 96, § 6. The relevant statutory language has not changed; therefore, this opinion uses the current citations.

acquisition and installation, until the allotment of the funds to be expended has been approved by the *office of financial management.*" RCW 43.88.110(7) (emphasis added). In addition, while the director of GA determines the location, size, and design of any real estate acquired on behalf of state agencies, those facilities "shall conform to standards adopted by the director *and approved by the office of financial management* governing facility efficiency unless a specific exemption from such standards is provided by the director of general administration." RCW 43.82.010(2) (emphasis added).

¶21 Here, the State's Option to Purchase set a price in excess of $9,000,000 for the property. Thus, the Office of Financial Management was obligated to review and approve the proposed purchase. *See* RCW 43.88.110(6). GA states they never did, and Properties does not dispute this.

## C. Approval by State Capitol Committee

¶22 Finally, "[t]he acquisition of real estate [by state agencies], and use thereof, shall be subject to the approval of the *state capitol committee* when the real estate is located in Thurston county." RCW 43.82.020 (emphasis added); *see also*, 1973 LETTER OP. ATT'Y GEN. No. 110, 1973 WL 154059 (discussing RCW 43.82.020 and the role of the Capitol Committee). Hawk's Prairie is in Thurston County. Thus, the proposed property acquisition required Capitol Committee approval. GA represents that the Capitol Committee initially authorized GA to enter into a no-cost option for 160 acres for a Lacey Light Industrial Park, but it never authorized *purchase* of the property. Again, Properties does not dispute this.

¶23 The Option Agreement specifically set forth GA's need to obtain legislative approval and funding, and the Purchase and Sale Agreement specifically set forth that the sale was subject to other governmental agency approval. Because GA never obtained the necessary approvals, the documents did not bind the State.

## III. Contracting Ultra Vires

¶24 Still, Properties maintains that GA and its authorized agent, Morgan, were empowered to legally bind the State to the Purchase and Sale Agreement. And, reasons Properties, GA had other funding sources for the purchase. Finally, Properties asserts that the State's failure to seek any necessary governmental approval does not excuse its performance under the Agreement. These arguments fail, however, because if GA proceeded without legislative and other governmental agency approval, it would have acted ultra vires.

¶25 An administrative agency created by statute has only those powers expressly granted or necessarily implied by that statute. *See Barendregt v. Walla Walla Sch. Dist. No. 140*, 26 Wn. App. 246, 249, 611 P.2d 1385 (1980) (citing *Ortblad v. State*, 85 Wn.2d 109, 117, 530 P.2d 635 (1975)). This is especially true "where the public treasury will be directly affected." *State ex rel. Bain v. Clallam County Bd. of County Comm'rs*, 77 Wn.2d 542, 548, 463 P.2d 617 (1970) (citing *State ex rel. Thurston County v. Dep't of Labor & Indus.*, 167 Wash. 629, 9 P.2d 1085 (1932)).

¶26 In *Finch v. Matthews*, 74 Wn.2d 161, 171, 443 P.2d 833 (1968), the court distinguished between a governmental agency's ultra vires act, which cannot be estopped, and the " 'irregular exercise of a granted power,' " which may be estopped if the contract relied on was within the agency's powers. *Barendregt*, 26 Wn. App. at 250 (quoting 31 C.J.S. *Estoppel* § 144 (1964)). If a state agent lacks legal authority, " 'no void act of theirs can be cured by aid of the doctrine of estoppel.' " *Barendregt*, 26 Wn. App. at 250 (quoting *Finch*, 74 Wn.2d at 172). Thus, a state agent cannot bind a governmental agency to a contract that is ultra vires, "even though the public body for which he acts may have clothed him with such indicia of authority that it would be estopped if it were a private person." *Barendregt*, 26 Wn. App. at 250 (citing *State v. O'Connell*, 83 Wn.2d 797, 825, 523 P.2d 872 (1974)).

¶27 Properties' arguments that the State should be bound, even though GA never obtained legislative funding or required governmental agency approvals, ignore the ultra vires mandate. GA and Morgan never had authority to bind the State to spend $9,757,440 on the property purchase. And no amount of alternative funding methods or ways to avoid the constitutional and statutory conditions can overcome the ultra vires bar to this transaction.

¶28 Affirmed.

BRIDGEWATER and VAN DEREN, JJ., concur.

Review denied at 155 Wn.2d 1003 (2005).