# NOTICE:   SLIP OPINION
## (not the court's final written decision)

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
NOVEMBER 10, 2021

_González, C.J._
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
NOVEMBER 10, 2021

ERIN L. LENNON
SUPREME COURT CLERK

## IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| WASHINGTON STATE LEGISLATURE, <br><br> Respondent, <br><br> v. <br><br> THE HONORABLE JAY INSLEE, in his official capacity as Governor of the State of Washington, <br><br> Appellant. | NO. 98835-8 <br><br> EN BANC <br><br> Filed: November 10, 2021 |

GORDON McCLOUD, J.—Washington's constitution permits the governor to veto whole bills, "entire section[s]" of bills, and "appropriation items." WASH. CONST. art. III, § 12. In this case, we are asked to determine whether Governor Inslee exceeded this constitutional authority when he vetoed a single sentence that appeared seven times in various portions of section 220 of ESHB 1160,[1] the 2019 transportation appropriations bill. Section 220 appropriated moneys to the Washington State Department of Transportation (WSDOT) for public transportation-related grants. The vetoed sentence (the "fuel type condition")

---

[1] ENGROSSED SUBSTITUTE H.B. 1160, 66th Leg., Reg. Sess. (Wash. 2019).

No. 98835-8

barred WSDOT from considering vehicle fuel type as a factor in the grant selection process.

Governor Inslee argues that the fuel type condition constituted a complete "appropriation item" and that such complete appropriation items are subject to gubernatorial veto. In the alternative, he argues that the fuel type condition violated article II, section 19's single subject and subject-in-title requirements and article II, section 37's bar on amendment without setting forth the amended statute in full. The legislature counters that the fuel type condition did not constitute a complete appropriation item and, hence, that it was not subject to gubernatorial veto; it also argues that the fuel type condition complied with article II, sections 19 and 37. The trial court entered summary judgment orders in favor of the legislature.

Like all cases involving the veto power, "[t]he importance of the case before us is that it deals directly with one of the cardinal and fundamental principles of the American constitutional system, both state and federal: the separation of powers doctrine." *Wash. State Motorcycle Dealers Ass'n v. State*, 111 Wn.2d 667, 674, 763 P.2d 442 (1988). It requires this court to step into its "historical, constitutional role" to "delineate and maintain the proper constitutional balance between the coordinate branches of our State government with respect to the veto." *Wash. State Legislature v. Lowry*, 131 Wn.2d 309, 313, 931 P.2d 885 (1997). And it requires us to embrace our duty, as the judiciary, to ""'say what the law is,'" even when that

No. 98835-8

interpretation serves as a check on the activities of another branch." *In re Salary of Juvenile Dir.*, 87 Wn.2d 232, 241, 552 P.2d 163 (1976) (citations omitted) (quoting *United States v. Nixon*, 418 U.S. 683, 703, 94 S. Ct. 3090, 41 L. Ed. 2d 1039 (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 176, 2 L. Ed. 60 (1803))).

We now affirm.

FACTUAL AND PROCEDURAL HISTORY

In 2019, the Washington Legislature passed ESHB 1160, titled "AN ACT Relating to transportation funding and appropriations." In section 220, the legislature appropriated moneys to WSDOT to issue transportation-related grants, subject to a number of "conditions and limitations." Section 220 first lists six accounts and the amount of moneys appropriated from each. In the 15 numbered paragraphs that follow, the bill specifies that certain amounts of the total appropriation must be used "solely" for nine specific grant programs. ESHB 1160. With regard to seven of those nine grant programs, the bill mandates that "Fuel type may not be a factor in the grant selection process." LAWS OF 2019, ch. 416, §220; ESHB 1160, § 220(1)(a), (b), (2), (3)(a), (5)(a), (7), (9) (the "fuel type condition"). Governor Inslee vetoed this fuel type condition each of the seven times it appeared.

ESHB 1160, as enacted by the legislature and partially vetoed by the governor, became effective May 21, 2019. The legislature filed a declaratory

3

judgment action seeking declarations that the governor's vetoes exceeded his veto authority under article III, section 12 of the Washington Constitution and that the legislature's inclusion of those fuel type conditions in section 220 complied with the Washington Constitution. Clerk's Papers (CP) at 1 (Compl. for Declaratory J.). The governor responded that his veto was valid and constitutional, and counterclaimed that even if his veto was invalid, the court should still strike the fuel type condition because it violates article II, sections 19 and 37 of the state constitution. CP at 9-10 (Answer to Compl. for Declaratory J.).

On cross motions for summary judgment, the superior court ruled for the legislature. CP at 187 (Order Granting Legislature's Mot. for Summ. J. & Denying Governor's Mot. for Summ. J.). It concluded that the vetoes exceeded the governor's article III, section 12 authority because the fuel type condition was not a complete "separate appropriation item[]." Verbatim Report of Proceedings (Jun. 19, 2020) (VRP) at 28. It also concluded that the fuel type condition did not violate article II, sections 19 and 37 because it was "not substantive legislation or law and does not directly conflict with existing statutes." *Id.* at 28-29. Governor Inslee appealed directly to this court, and we retained the case for decision.

STANDARD OF REVIEW

We review a trial court's orders on summary judgment de novo. *Enter. Leasing, Inc. v. City of Tacoma*, 139 Wn.2d 546, 551, 988 P.2d 961 (1999).

No. 98835-8

"Where, as here, the parties do not dispute the material facts, this Court will affirm an order on summary judgment if the moving party is entitled to judgment as a matter of law." *Id.* at 551-52. This case raises issues of constitutional interpretation, which we also review de novo. *State v. MacDonald*, 183 Wn.2d 1, 8, 346 P.3d 748 (2015).

ANALYSIS

I.    UNDER OUR PRECEDENT, THE GOVERNOR'S VETO OF THE FUEL TYPE
      CONDITION EXCEEDED HIS VETO POWER UNDER ARTICLE III, SECTION 12

The state constitution empowers the governor to veto whole bills, "entire section[s]" of bills, and "appropriation items." WASH. CONST. art. III, § 12. It is clear that the sentence "Fuel type may not be a factor in the grant selection process" does not comprise a whole bill or an "entire section" of a bill. *Id.* As a result, the governor's veto of this sentence is valid only if the sentence comprised a whole "appropriation item." *Id.*

We have observed that "[t]here is no more difficult and controversial aspect of relations between our branches of government than the Governor's use of the veto." *Lowry*, 131 Wn.2d at 312. Because of the magnitude of the interests at stake, "[t]he [Washington] Supreme Court must not abdicate its constitutional duty to act as an impartial referee of constitutional disputes between the legislative and executive branches of government in cases involving the gubernatorial veto." *Id*. at

5

330-31. We begin with a brief overview of the constitutional history of the gubernatorial veto power in our state.

       A. <u>The history of the constitutional veto power shows a clear intent to carefully limit this extraordinary power</u>

Since the 1889 adoption of the state constitution, article III, section 12 has granted the governor the power to veto entire bills, subject to override by a two-thirds majority of the legislature.[2] In addition to this general veto power, the constitution has also granted the governor a "partial veto" power, which permits him or her to veto smaller portions of bills, subject to the same two-thirds legislative override. The original text of the 1889 Washington State Constitution article III, section 12 read, in relevant part:

> If any bill presented to the Governor contain several *sections* or *items*, he may object to one or more sections or items while approving other portions of the bill.

(Emphasis added.)

---

[2] Article III, section 12 begins, "Every act which shall have passed the legislature shall be, before it becomes a law, presented to the governor. If he approves, he shall sign it; but if not, he shall return it, with his objections, to that house in which it shall have originated, which house shall enter the objections at large upon the journal and proceed to reconsider. If, after such reconsideration, two-thirds of the members present shall agree to pass the bill it shall be sent, together with the objections, to the other house, by which it shall likewise be reconsidered, and if approved by two-thirds of the members present, it shall become a law."

6

No. 98835-8

This partial veto power serves two important purposes. First, it "is designed to permit the Governor to disentangle issues so they will be considered on their individual merits," consistent with the other constitutional checks on legislative "logrolling." *Lowry*, 131 Wn.2d at 316-17 (citing Stephen Masciocchi, *The Item Veto Power in Washington*, 64 WASH. L. REV 891, 892-93 & n.13 (1989)). Second, the item veto in particular permits the governor to "excise unneeded 'pork barrel' programs or projects from an appropriations bill" to "achieve fiscal constraint and to advance statewide rather than parochial fiscal interests." *Id*. at 316.

When the governor exercises this veto power, he or she acts in a limited legislative capacity. *Wash. State Grange v. Locke*, 153 Wn.2d 475, 486-87, 105 P.3d 9 (2005) (citing *Hallin v. Trent*, 94 Wn.2d 671, 677, 619 P.2d 357 (1980); *Wash. Ass'n of Apt. Ass'ns v. Evans*, 88 Wn.2d 563, 565, 64 P.2d 788 (1977)). This has led to conflicts between the legislature and the executive over the scope of the veto power. In "the 1950s, 1960s, and early 1970s, governors increasingly vetoed items that were less than entire sections of nonappropriation bills"—sometimes excising portions as small as clauses within sentences.[3] *Id.* (citing *Motorcycle*

_____

[3] An oft-cited example of this practice is discussed in *Apartment Associations*, 88 Wn.2d 565. In the events leading up to this case, then-Governor Evans vetoed portions of the Residential Landlord-Tenant Act of 1973, ch. 59.18 RCW, ranging from full paragraphs to clauses within sentences. The effect of the vetoes was to "completely rewrite portions of the legislation" and make the overall bill favor tenants far more strongly than the original bill had done. *Lowry*, 131 Wn.2d at 317. Applying the later

No. 98835-8

*Dealers*, 111 Wn.2d at 671-72). This practice "resulted in part from the decisions of this court in *Cascade Tel. Co. v. State Tax Comm'n,* 176 Wash. 616, 30 P.2d 976 (1934) (holding that a 'section' in the original Const. art. 3, § 12 would be construed to mean any portion of a bill with separate, distinct and independent subject matter), and *State ex rel. Ruoff v. Rosellini,* 55 Wn.2d 554, 348 P.2d 971 (1960) (holding that an 'item' under original Const. art. 3, § 12 was not limited to matters in an appropriation bill)." *Motorcycle Dealers*, 111 Wn.2d at 671.

This "greatly expanded use of the partial veto" led to a constitutional amendment known as Senate Joint Resolution (SJR) 140. *Id.* at 672. The "Statement for" SJR 140 in the voters' pamphlet made clear that the amendment was designed to limit the governor's partial veto power:

> Washington is the only state in the nation in which the Governor exercises practically unlimited power to remove portions from laws passed by the Legislature. This "item veto" power has been interpreted by recent Governors to apply to any element of a bill down to a single word.
>
> It empowers our Governors to act in effect as an unseparated third house of the Legislature to alter measures substantially prior to signing them into law. This is contrary to the grant of authority allowed our nation['s] Presidents under the Federal Constitution—which is to reject entire pieces of legislation by veto, not to change them.
>
> *SJR 140 is a moderate compromise proposal passed with bipartisan support. It will not completely eliminate this unparalleled power, but limit it*

---

discarded affirmative-negative test, this court held that Governor Evans' vetoes were invalid. *Apt. Ass'ns*, 88 Wn.2d at 573.

No. 98835-8

> *to the veto of sections of bills as well as entire bills, and even provides that budget bills would still be subject to the item veto.*

*Id*. (quoting SJR 140, Official Voters Pamphlet (General Election 1974)).

SJR 140 passed in 1974 and became the 62d Amendment to the Washington Constitution. The amendment added language limiting the partial veto power, such that the relevant portion of the state constitution's article III, section 12 currently reads:

> If any bill presented to the governor contain several sections or *appropriation* items, he may object to one or more sections or *appropriation items* while approving other portions of the bill: *Provided,* That he may not object to less than an *entire* section, except that if the section contain one or more appropriation items he may object to any such appropriation item or items.

(Most emphasis added.) The amendment also granted the legislature the power to reconvene after adjournment of the regular session "solely to reconsider any bills vetoed" and to override any such vetoes by a two-thirds majority. *Id.* Thus, the governor currently has the power to veto an entire bill, one or more "entire section[s]" of a bill, and one or more "appropriation items" within a bill.

Veto-related litigation both before and after the 62d Amendment has mostly addressed the scope of the "section" veto. Our early, preamendment cases emphasized that the decision about what constitutes a "section" falls within the province of the judiciary, not the legislature. *E.g.*, *Apt. Ass'ns*, 88 Wn.2d at 565-66 (discussing *Spokane Grain & Fuel Co. v. Lyttaker*, 59 Wash. 76, 86, 109 P. 316

No. 98835-8

(1910), in which court applied "affirmative-negative" test, premised on the idea that "the veto power must be exercised in a destructive and not a creative manner," meaning that a veto that had the effect of "reach[ing] a new or different result from what the legislature intended" was invalid); *Cascade Tel. Co.*, 176 Wash. at 619 (applying "separate subject" test under which the meaning of "section" was not "always" limited by the "artificial construction of the legislative measure"; instead, a "section" constituted any portion of a bill containing separate, distinct, and independent subject matter).

The judiciary still retains the power to interpret the scope of the constitution's veto power. But the 62d Amendment signaled a change in how we balance the powers of the other two branches. Specifically, we recognized that the voters' adoption of the amendment represented a "direct[] and forceful[]" reaction to restore the balance of power between the executive and legislative branches and to rein in perceived executive overreach. *Motorcycle Dealers*, 111 Wn.2d at 675. The amendment's text showed this: it "added a new express prohibition against partially vetoing anything less than 'an *entire* section'…of a nonappropriation bill," and it limited the item veto to appropriations bills. *Id.* at 673-74. We therefore jettisoned the earlier "affirmative-negative" and "separate subject" tests for evaluating the validity of vetoes on the ground that those tests were "unworkable and subjective" and that they provided "no standards to predict

10

No. 98835-8

whether a veto will be perceived by the court" as valid or invalid. *Wash. Fed'n of State Emps., AFL-CIO, Council 28 v. State*, 101 Wn.2d 536, 546, 682 P.2d 869 (1984) (abandoning affirmative-negative test); *Motorcycle Dealers*, 111 Wn.2d at 677-78 (quoting *Wash. Fed'n*, 101 Wn.2d at 546) (abandoning separate subject test as "every bit as vague and uncertain as the affirmative-negative test"). We adopted a test that was based more on deference to the legislature's formatting decisions; we explained, in part, that the older, rejected tests constituted "an intrusion into the legislative branch, contrary to the separation of powers doctrine, and substitute[d] judicial judgment for the judgment of the legislative branch." *Wash. Fed'n*, 101 Wn.2d at 546 (internal citations omitted).

B. After the 62d Amendment, <u>*Lowry* and *Locke*[4] held that we defer to the legislature's designation of what constitutes a whole "appropriation item" subject to gubernatorial veto unless the legislature clearly attempted to circumvent that veto power</u>

We first interpreted the term "appropriation item" against this historical backdrop. First, in *Lowry*, the legislature challenged the governor's exercise of two types of partial vetoes: the "section" veto and the "appropriation item" veto. 131 Wn.2d at 313. In that case, the legislature had formatted 103 unrelated repealers as subsections of one single section of a nonappropriations bill. *Id.* at 313-14. Then Governor Lowry then vetoed several of these repealers. *Id.*

---

[4] *Wash. State Legislature v. State*, 139 Wn.2d 129, 985 P.2d 353 (1999) (*Locke*).

11

No. 98835-8

We acknowledged that "'[t]he Legislature's designation of a section is conclusive unless it is obviously designed to circumvent the Governor's veto power and is 'a palpable attempt at dissimulation.'" *Id.* at 320-21 (quoting *State ex rel. Hamilton v. Martin*, 173 Wash. 249, 257, 23 P.2d 1 (1933)). But we ruled that the legislature had committed just such circumvention and dissimulation by lumping all of those related repealers into a single section. We therefore declined to defer to the legislature's designation of a section and upheld the vetoes. *Id.* at 321.

At the same time, then Governor Lowry also vetoed several sentences of an appropriations bill relating to state patrol vehicles, a state educational need grant program, a statewide collocation program, and other matters. *Id.* at 313-15. As a result, we had to determine whether each vetoed sentence constituted an entire "appropriation item" subject to the constitutional veto power. *Id.* The *Lowry* court answered this question by explaining that "any budget proviso with a fiscal purpose contained in an omnibus appropriations bill is an 'appropriation[] item' under article III, section 12," but that a veto of "anything less than the *whole proviso*" is invalid.[5] *Id.* at 323 & n.8 (emphasis added).

---

[5] The *Lowry* court distinguished between two types of budget provisos within appropriations bills: dollar and nondollar provisos. "Dollar provisos" contain language "conditioning the appropriation to an agency on compliance with legislative direction that

No. 98835-8

In determining the parameters of a "whole proviso," *Lowry* said that we start with the presumption that a "whole proviso" is equivalent to a "full subsection[] of the section of an appropriations bill."[6] *Id.* Applying this rule, the court upheld all of the challenged appropriation item vetoes. *Id.* at 331.

We interpreted the scope of the appropriation item veto again, two years later, in *Locke*, 139 Wn.2d 129. The *Locke* court acknowledged that the *Lowry* court had not "adequately answer[ed] the question" of "what is a whole proviso?" (to which the gubernatorial veto power extends)—so the *Locke* court provided

---

certain funds be spent or not spent, or the agency take or not take certain action." *Lowry*, 131 Wn.2d at 314. "Nondollar provisos" also "condition an agency appropriation on the agency's taking or not taking certain action," but they "make[] no reference whatsoever to a monetary amount." *Id.* at 325, 314. *Lowry* made clear that the governor can veto both types of budget provisos but only if the veto encompasses the "whole" appropriation item. *Id.* at 314, 323 & n.8.

    [6] The *Lowry* court made this statement in a footnote, which reads:

        The budget provisos to which the Governor's line item veto extends include full provisos to an appropriations bill, that is, full subsections of the section of an appropriations bill. We do not believe an "appropriation[] item" may be a sentence, phrase, letter, digit, or anything less than the whole proviso.

131 Wn.2d at 323 n.8. We agree in full with the first sentence of the footnote. It must be noted, however, that there is some tension between the second sentence of the footnote and *Lowry*'s outcome. Specifically, the *Lowry* court upheld the veto of several single sentences. *Id.* at 314 & n.2. Most of those sentences were also "full subsections"—but one was not. *Id.* at 324 (upholding veto of single sentence contained within larger subsection). And the *Lowry* court referred to the single vetoed sentence that appeared within a larger paragraph of text as, itself, a "subsection." *Id.* We take this opportunity to clarify *Lowry* and emphasize that a sentence that is "less than [a] whole proviso" may not be vetoed as an appropriation item. *Id.* at 323 n.8.

13

No. 98835-8

further guidance on that subject. *Id*. at 142. *Locke* explained that just as this court begins by deferring to the legislature's designation of what constitutes an "entire section" for the purpose of analyzing a section veto, this court must also begin by deferring to the legislature's designation of what constitutes a "whole" "appropriation item" when analyzing an appropriation item veto. *Id.* at 141 (quoting *Lowry*, 131 Wn.2d at 320-21).

We again recognized that even though we "generally defer to the Legislature as to its divisions within legislation, such deference is not absolute." *Id*. (quoting *Lowry*, 131 Wn.2d at 320-21). If the court determines that the legislature's designation of a subsection "'is obviously designed to circumvent the Governor's veto power,'" then we "'reserve the right to strike down such maneuvers.'" *Id.* (quoting *Lowry*, 131 Wn.2d at 320-21). But only an obvious attempt to circumvent the veto power will overcome deference to the legislature's designation of the scope of a whole appropriation item. *Id.*[7] Absent such obvious

---

[7] The dissent suggests that this interpretation of *Locke* is "simply wrong" because it "defies *Lowry*" and "elevates dicta" from *Lowry*'s footnote 8 to the status of a legal holding. Dissent at 10, 8, 4. To the contrary, our reading is one that harmonizes *Lowry* and *Locke*, paying careful attention to how *Locke* itself interpreted *Lowry. Locke* very clearly applied the *Lowry* deference analysis to the appropriation item veto in that case, *only* proceeding to look more deeply into the "practical impact" of the language once it determined that "the specter of circumvention" had been sufficiently raised to justify not deferring to the legislature's designation. *Locke*, 139 Wn.2d at 141. In this way, *Locke* extended the reasoning of *Lowry* by quoting, and then *explicitly applying*, the presumption of deference to the appropriation item veto context, where *Lowry* had only

14

No. 98835-8

manipulation, we defer to the legislature's designation of a "full subsection" of an appropriations bill as a "single and complete" proviso, "incapable of division." *Id.*

The *Locke* court found that the legislature had committed just such manipulation. The budget bill at issue there[8] appropriated moneys to the Department of Social and Health Services (DSHS), subject to conditions set forth in numbered subsections. Subsection (6) concerned childcare assistance; it provided:

> $73,129,000 of the general fund—federal appropriation is provided solely for child care assistance for low-income families in the WorkFirst program and for low-income working families as authorized in [EHB] 3901. All child care assistance provided shall be subject to a monthly copay to be paid by the family receiving the assistance.

*Id.* at 134. Subsection (6) was followed by three subparts labeled (a), (b), and (c), which laid out in detail the monthly childcare assistance copayment schedule. *Id.* at 134-35. Governor Locke vetoed subparts (a), (b), and (c), but he did not veto the last sentence of (6).

The *Locke* court struck down this veto as unconstitutional and based its decision on two main factors. First, the court looked at the tortured history of the

___

discussed it in the section veto context. *Id.*; *cf.* dissent at 7. And *Locke*'s extension of that reasoning was eminently sensible, given the separation of powers issues at play in the budget context. *See infra* at 17.

[8] LAWS OF 1997, ch. 454, § 204.

15

No. 98835-8

copayment provision. We explained that the provision had had "a life of its own" before becoming part of subsection (6) of the appropriations bill: it had previously been inserted into both an appropriations bill and a substantive bill, and the governor had vetoed it both times. *Locke*, 139 Wn.2d at 147, 133-35. Given that history, we found that subsection (6) "raise[d] the specter of [legislative] circumvention sufficiently to disregard deferring to the Legislature's designation of (6) as a single and complete 'subsection,' incapable of division." *Id.* at 141.

Next, we examined the text of the bill. We explained that "an examination of the language in question and the operative effect of such language indicates the nature of the proviso." *Id.* at 143. We continued that the final sentence of subsection (6) preceding the (a), (b), (c) subparts, combined with those three, immediately following subparts, comprised a "single, whole . . . proviso" because they all addressed the same specific subject and they all "naturally fit together." *Id.* at 144. We concluded that this language and history showed that the governor had vetoed only subparts of a single, whole appropriations item. *Id.* The *Locke* court therefore invalidated the veto.

Read together, *Lowry* and *Locke* hold that unless the legislature clearly attempts to circumvent the governor's veto power, we must presume that a legislatively designated "full subsection" constitutes a whole, indivisible appropriation item. We look at the history, text, and form of the legislation at issue

16

No. 98835-8

to decide whether the legislature has attempted such circumvention. And we consider each of these factors against the backdrop of separation of powers principles, particularly the fact that the legislature is the branch entrusted with the power to control appropriations.

C.  When interpreting the 62d Amendment, we also consider the fact that the legislature is the branch entrusted with the power to control appropriations

We have "expressly" declined to provide "bright-line definitions of legislative or gubernatorial manipulation." *Lowry*, 131 Wn.2d at 321. But we do know that impermissible manipulation occurs if the legislation "clearly undermines the powers of a coordinate branch of government." *Eyman v. Wyman*, 191 Wn.2d 581, 604, 424 P.3d 1183 (2018) (plurality opinion) (discussing *Lowry*, 131 Wn.2d at 320-32).

This is an objective inquiry that requires us to examine the history, form and "practical impact" of the legislation at issue. *Locke*, 139 Wn.2d at 140-44; *see also, e.g.*, *Lowry*, 131 Wn.2d at 321-28; *Eyman*, 191 Wn.2d at 602-606 (manipulation does not require "a subjective, conscious," or bad-faith attempt by individual legislators to undermine the executive's veto power).

It also requires us to examine each of these factors in light of the foundational constitutional principle of separation of powers, which "ensure[s] that the fundamental functions of each coordinate branch of government remain

17

inviolate." *Carrick v. Locke*, 125 Wn.2d 129, 135, 882 P.2d 173 (1994). A fundamental function of the legislature is "to set policy and to draft and enact laws." *Hale v. Wellpinit Sch. Dist. No. 49*, 165 Wn.2d 494, 506, 198 P.3d 1021 (2009); WASH. CONST. art. II, § 1. This means that the legislature holds the "exclusive power of deciding how, when, and for what purpose public funds should be used by governmental agencies in carrying on the state's business." *State ex rel. Decker v. Yelle*, 191 Wash. 397, 400, 71 P.2d 379 (1937) (discussing WASH. CONST. art. VIII, § 4). This power of the purse undergirds the legislature's ability to serve as a check on the power of the executive. *Juvenile Dir.*, 87 Wn.2d at 242-43 ("Legislative control over appropriations . . . [is an] example[] of direct control by one branch over another." (citing U.S. CONST. art. I, §§ 8, 9; WASH. CONST. art. VIII, § 4; *Train v. City of New York*, 420 U.S. 35, 95 S. Ct. 839, 43 L. Ed. 2d 1 (1975))).

For that reason, judicial deference to the legislature's decision on how to format its bills—especially its appropriations bills—best comports with separation of powers principles. *Cf. Eyman*, 191 Wn.2d at 596-97 (discussing enrolled bill doctrine, which is rooted in separation of powers and which prevents judiciary from inquiring into the process by which a bill was passed once the bill has been certified by the legislature).

18

D. <u>In this case, the governor fails to show a clear legislative attempt to circumvent the gubernatorial veto power; we therefore defer to the legislature's designation of what constitutes a whole appropriation item in section 220</u>

Here, the legislature argues that it neither circumvented the governor's veto power nor manipulated its usual formatting to achieve such impermissible circumvention. The legislature concludes that we should therefore defer to its designation of what constitutes a subsection containing the fuel type condition as a whole, indivisible appropriation item. Resp. Br. of Wash. State Legislature (Resp. Br.) at 14-15.

The decisions discussed above require us to address that issue by analyzing the text, history, form, and practical impact of the legislation at issue in the context of the legislature's role as guardian of the state's purse strings. Using that analysis, we agree with the legislature: the governor has failed to show any legislative intent to manipulate or circumvent the gubernatorial veto, so we must defer to the legislature's designation of what constitutes a single, whole appropriation item.

1. *Section 220's format shows no clear attempt to circumvent the governor's veto power*

Far from "alter[ing] the natural sequences and divisions of a bill," the formatting of section 220 is typical of the manner in which the legislature generally formats appropriations bills. *Lowry*, 131 Wn.2d at 320-21. The section begins with

19

an appropriation of money from various accounts. ESHB 1160, § 220. The subsections following, including the subsections containing the fuel type condition, begin by appropriating money out of the general appropriation and continue by listing further conditions on that money's use. For example, section 220(9) reads, "$2,000,000 of the multimodal transportation account—state appropriation is provided solely for transit coordination grants. Fuel type may not be a factor in the grant selection process."

Section 220's format differs markedly from the "clever formatting," *Eyman*, 191 Wn.2d at 604, that showed legislative manipulation in *Lowry*. The formatting in *Lowry* was exceptional.  The legislature placed 103 unrelated repealers into one section of a nonappropriations bill. That presented the governor with the Hobson's choice of vetoing the entire section in order to veto any individual repealer, or vetoing none at all. *Lowry*, 131 Wn.2d at 319-20. Governor Inslee faced no such choice in this case—he could have vetoed each single appropriation with its associated single fuel type condition.

The governor argues that the legislature could have formatted the bill differently:  it could have placed the fuel type condition in its own designated subsection and cross-referenced the portions of section 220 to which that condition applied.  The governor continues that the legislature's failure to structure the bill in this manner shows that it was attempting to "insulate its policy change from either

20

No. 98835-8

the Governor's section or appropriation item veto authority." Governor's Opening Br. at 36.

We disagree. This formatting choice did not nullify the governor's partial veto power. As stated above, the governor could still have exercised the appropriation item veto in this case by vetoing a whole appropriation item, i.e., a full subsection. He could have also vetoed the entire section. And if the fact that the legislature *could have* structured a bill differently is enough, the deference requirement would have no meaning; there is always another way to structure any given bill. Second-guessing legislative drafting choices that way would violate separation of powers principles and improperly invade the province of the legislature. WASH. CONST. art. II, § 1.

> 2. *Section 220's history shows no clear attempt to circumvent the governor's veto power*

Section 220's history also differs markedly from the history of the vetoed bill portions in *Locke*. In that case, the childcare copay proviso's history showed that the legislature was trying to repackage a twice-vetoed provision into an "unvetoable" format. That history raised the "specter of circumvention" sufficiently to convince the court to "disregard deferring to the Legislature's designation of (6) as a single and complete 'subsection,' incapable of division." *Locke*, 139 Wn.2d at 141.

21

No. 98835-8

By contrast, the fuel type condition in this case had never before been enacted and had never before been vetoed. Instead, the fuel type condition was inserted into and deleted from section 220 through a series of complex legislative compromises that encompassed both ESHB 1160 and the "green grant program" codified by E2SHB 2042.[9] Resp. Br. at 35-37.

In other words, the history of the fuel type condition in this case shows the normal internal workings of the legislative process. It is not comparable to the legislature's impermissible attempt to override the governor's veto power by reformatting and reinserting previously vetoed language into new bills. *See id.*

> 3. *Section 220's language and operative effect show no clear attempt to circumvent the governor's veto power*

Turning to the substance of the legislation, we "examin[e] . . . the language in question and the operative effect of such language." *Locke*, 139 Wn.2d at 143. This examination convinces us that the fuel type condition, in isolation, does not constitute a whole appropriation item. *Id.*

In *Locke*, subsection (6) provided:

> $73,129,000 of the general fund—federal appropriation is provided solely for child care assistance for low-income families in the WorkFirst program and for low-income working families as authorized in [EHB] 3901. All child care assistance provided shall be subject to a monthly copay to be paid by the family receiving the assistance.

---

[9] ENGROSSED SECOND SUBSTITUTE H.B. 2042, 66th Leg., Reg. Sess. (Wash. 2019).

22

*Id.* at 134. As discussed above, subsection (6) was followed by three subdivisions labeled (a), (b), and (c); they provided a detailed monthly copay schedule. *Id.* at 134-35. We examined the operative effect of the language and determined that the first sentence of (6) was a "dollar proviso" allocating the $73 million for childcare assistance. *Id.* at 141. But the second sentence of (6) and the following subdivisions (a)-(c) comprised a separate, indivisible, "whole . . . proviso" because they addressed the same specific subject and "naturally fit together." *Id.* at 144. This court also emphasized the fact that the copayment proviso was "only tangentially related to the $73 million appropriation, as it establishes criteria poor families must meet in order to *receive* disbursements *from* DSHS out of the appropriated sum designated in the first sentence of (6) for child care."[10] *Id.* at 141-42. It did not establish prerequisites to the agency appropriation.

By contrast, the fuel type condition in this case relates directly to the appropriation amount that begins each subsection of section 220 in which the condition appears. The fuel type condition restricts the way WSDOT can spend those appropriated funds. This is the opposite of what the copayment proviso accomplished in *Locke*. The *Locke* copayment proviso did not direct the manner in

---

[10] *See also Lowry*, 131 Wn.2d at 325-26 (upholding vetoes of provisos that were similarly only tangentially related to any appropriation amount).

No. 98835-8

which the agency must *expend* the appropriated money at all; it related to a different way of offsetting the cost of childcare. *Id.* at 144. Thus, following *Locke*, the fuel type condition does not stand alone as a "single, whole . . . proviso." *Id.* Instead, it "naturally fit[s] together" with the relevant appropriation amount to form a single, whole appropriation item that could have been vetoed in its entirety, each time it appeared—or not at all. *Id.*

> 4. *We therefore defer to the legislature's designation of what constitutes a whole appropriation item in section 220*

Separation of powers principles require us to begin with a presumption of deference to the legislature's designation of appropriation items. But it is a fundamental duty of this court to interpret the constitution and to "act as an impartial referee of constitutional disputes between the legislative and executive branches of government in cases involving the gubernatorial veto." *Lowry*, 131 Wn.2d at 330-31. Thus, when it is clear that the legislature's method of formatting legislation undermines the constitutional powers of the coequal executive branch of government, this court must step in to protect the governor's veto power.[11] *Id.*

---

[11] In his veto message, Governor Inslee said the fuel type condition was "contrary to, and in direct conflict with" existing statutory law governing the criteria WSDOT must consider in selecting grant recipients and therefore amounted to an indirect amendment in violation of article II, section 37. CP at 53. The governor appeared to concede that the fuel type condition comprised less than an entire constitutional "appropriation item." *Id.* at 53-54. But, in this "very rare and unusual circumstance," Governor Inslee stated he "ha[d] no choice but to veto a single sentence in several subsections to prevent a

24

No. 98835-8

As *Locke* instructs, once such manipulation is shown, the court will decline to defer to the Legislature's formatting devices and will look deeper to determine the parameters of whole appropriation items. *Id.*

The dissent repeatedly mischaracterizes our holding today as one that somehow erodes or eliminates the constitutional distinction between the section veto and the appropriation item veto. Dissent at 1, 2, 6, 9. But our holding today does not, and cannot, do any such thing. Under the constitution, the governor remains free to veto an "entire section" of a bill. WASH. CONST. art. III, § 12. The governor also remains free to veto "one or more appropriation items," *id.*—which remain, necessarily, "something less than a full *section* of a bill." *Lowry*, 131 Wn.2d at 322 (emphasis added); *cf.* dissent at 9. Our holding today simply reaffirms that under this court's precedent in *Lowry* and *Locke*, the scope of a whole appropriation item is presumptively a full *subsection*—not a <u>*section*</u>—of an

_____

constitutional violation and to prevent a forced violation of state law." *Id.* at 54. However, as the legislature notes, the governor has no power to veto legislation simply because he believes it to be unconstitutional, unless that legislation falls into a category to which the veto power extends. Resp. Br. at 25. The parties do not argue that the governor's concession has any effect on the issue before this court. We agree. *Grange*, 153 Wn.2d at 490-91 (citing *Cascade Tel. Co.*, 176 Wash. at 621 (the giving of a reason by the governor in a veto message is for the information of the legislature only)). Instead, "the construction of the meaning and scope of a constitutional provision is exclusively a judicial function." *Phila. II v. Gregoire*, 128 Wn.2d 707, 714, 911 P.2d 389 (1996). But if a budget bill contains impermissible substantive or amendatory law, the constitutional remedy of a challenge under article II, sections 19 and 37 remains open—and indeed, Governor Inslee made such a challenge here. *See Lowry*, 131 Wn.2d at 333 (Madsen, J., concurring and dissenting).

25

No. 98835-8

appropriations bill. Pursuant to *Locke*, that presumption can be overcome upon a showing that the legislature has impermissibly attempted to circumvent the governor's veto power. 139 Wn.2d at 141.

The form and substance of the legislation at issue here do not show such impermissible legislative manipulation or circumvention of the governor's veto power. Section 220's format does not undermine the governor's veto power and the fuel type condition does not stand on its own as a "whole" budget proviso. Nor did that format prevent the governor from exercising his appropriation item veto: if he wanted to strike the fuel type condition, he could have vetoed each whole appropriation (meaning each full subsection) in which that condition appeared.

We therefore affirm the trial court's grant of summary judgment to the legislature on this issue.

II.     THE FUEL TYPE CONDITION DOES NOT VIOLATE ARTICLE II, SECTION 19

Washington's constitution restricts legislation to a single subject. WASH. CONST. art. II, § 19 ("No bill shall embrace more than one subject, and that shall be expressed in the title."). This constitutional restriction applies to all legislation, including appropriations bills. *Flanders v. Morris*, 88 Wn.2d 183, 188, 558 P.2d 769 (1977). It promotes clarity in legislation and helps prevent logrolling. *Id.* at 187.

No. 98835-8

As a result, we have "repeatedly indicated the Legislature may not abolish or adopt substantive law in a[ nonsubstantive] appropriations bill" because doing so would undermine both of section 19's constitutional purposes.[12] *Lowry*, 131 Wn.2d at 328 n.11. We have also come to that conclusion because "[a]n appropriation bill is not a law in its ordinary sense" but "pertain[s] only to the administrative functions of government," and so it is an improper vehicle for the passage of substantive legislation. *State ex rel. Blakeslee v. Clausen*, 85 Wash. 260, 272, 148 P. 28 (1915).

Governor Inslee argues that the fuel type condition violates article II, section 19, mainly because it constitutes substantive law; specifically, the governor asserts that the fuel type condition amends RCW 47.66.040(2), which lists the factors that WSDOT must consider when deciding which multimodal program to fund. Governor's Opening Br. at 40.

We disagree. We enforce constitutional subject matter limits on the legislature's appropriations power. But we have long recognized that "greater latitude must be granted the legislature in enacting multi-subject legislation under

---

[12] *See, e.g.*, *Inlandboatmen's Union of Pac. v. Dep't of Transp.*, 119 Wn.2d 697, 710, 836 P.2d 823 (1992); *Retired Pub. Emps. Council of Wash. v. Charles*, 148 Wn.2d 602, 629, 62 P.3d 470 (2003); *Locke*, 139 Wn.2d at 145; *Serv. Emps. Int'l Union, Local 6 v. Superintendent of Pub. Instruction*, 104 Wn.2d 344, 705 P.2d 776 (1985); *Flanders*, 88 Wn.2d at 187-88; *State ex rel. Wash. Toll Bridge Auth. v. Yelle*, 54 Wn.2d 545, 551, 342 P.2d 588 (1959).

27

No. 98835-8

the appropriations bill title than any other, since the purpose of appropriations bills is to allocate monies for the State's multitudinous and disparate needs." *Flanders*, 88 Wn.2d at 188. And "allocat[ion of] monies for the State's . . . needs" is, of course, a core power of the legislature. WASH. CONST. art. VIII, § 4 ("No moneys shall ever be paid out of the treasury of this state, or any of its funds, or any of the funds under its management, except in pursuance of an appropriation by law."); *State ex rel. Peel v. Clausen*, 94 Wash. 166, 173, 162 P. 1 (1917) (noting that under article VIII, section 4, "no moneys can be paid out without the sanction of the legislative body").

In fact, the legislature maintains "exclusive power" over the public fisc. *Decker*, 191 Wash. at 400. This includes "'the right to specify how appropriated moneys shall be spent.'" Kate Stith, *Congress' Power of the Purse*, 97 YALE L. J. 1343, 1353-54 (1988) (quoting RAOUL BERGER, EXECUTIVE PRIVILEGE: A CONSTITUTIONAL MYTH 113 (1974)); *Flanders*, 88 Wn.2d at 191 (recognizing that "in certain instances the legislature must place conditions and limitations on the expenditures of monies"); *accord* 1987 Op. Att'y Gen. No. 6, at 12 ("[T]he Legislature is generally free, when making appropriations in an appropriation act, to limit the use to which the money appropriated can be put by state agencies and institutions."). "All appropriations thus may be conceived of as lump-sum grants with 'strings' attached. These strings, or conditions of expenditure, constitute

28

No. 98835-8

legislative prescriptions that bind the operating arm of government." Stith, *supra*, at 1353-54.

Those "strings" allow the legislature to fulfill its constitutional role and to check the power of the executive. *See Juvenile Dir.*, 87 Wn.2d at 242-43.

But there is a difference between such "strings," which the legislature may include in an appropriations bill, and "substantive law," which it may not. We have "decline[d] to adopt a categorical definition of 'substantive law,'" but the *Locke* court surveyed our cases and summarized three nonexclusive factors that "may . . . indicate substantive law is [impermissibly] present" in an appropriations bill: (1) "where the policy set forth in the budget has been treated in a separate substantive bill," (2) where "its duration extends beyond the two year time period of the budget," or (3) where "the policy defines rights or eligibility for services." 139 Wn.2d at 147. The first *Locke* factor overlaps with the rule that a provision in an appropriations bill violates article II, section 19 if it "abolish[es] or amend[s] existing law." *Flanders*, 88 Wn.2d at 188; *Serv. Emps. Int'l Union, Local 6,* 104 Wn.2d 344, 351, 705 P.2d 776 (1985); *see also State ex. rel. Wash. Toll Bridge Auth. v. Yelle*, 54 Wn.2d 545, 551, 342 P.2d 588 (1959).

None of these factors are present here.

The governor begins with the first *Locke* consideration. He argues that the fuel type condition violates article II, section 19 because it substantively amends

No. 98835-8

RCW 47.66.040(2), which lists the criteria WSDOT must consider when deciding

which multimodal programs and projects to grant-fund. Governor's Opening Br. at

40. Those mandatory criteria include "federal and state air quality requirements"

and "energy efficiency issues." RCW 47.66.040(2)(a)-(b). "Fuel type" is absent

from that list of mandatory criteria. *Id.* The governor contends that fuel type is an

"important component of air quality and energy efficiency," so the fuel type

condition effectively amends the law to "omit" this consideration. Governor's

Opening Br. at 41. But he points to no evidence in the record showing that

WSDOT ever considered fuel type within those mandatory criteria. And there

appear to be no WACs or other regulations implementing RCW 47.66.040, much

less any rules or regulations establishing that fuel type has been deemed "relevant

and influential," as the governor claims. *Id.* at 43.[13]

The governor's argument assumes that because fuel type *could* relate to

some of the mandatory criteria listed in a separate, substantive law, the legislature

cannot even mention fuel type in an appropriations bill. But that would mean that

---

[13] As the legislature points out, "[t]he 1993 Legislature"—which first enacted RCW 47.66.040—"was unlikely to have thought about fuel type at all, given that it was not until 1997 that the first mass-produced hybrid car came to market." Resp. Br. at 30 (citing Hiroko Tabuchi, *Toyota Aims to Remain King of the Hybrids*, N.Y. TIMES, Jan. 6, 2011, https://www.nytimes.com/2011/01/07/business/global/07toyota.html). It appears WSDOT has dutifully considered "energy efficiency issues" and "air quality requirements" under RCW 47.66.040(2) for nearly 30 years without ever considering fuel type.

No. 98835-8

the legislature could never enact an exclusive list of mandatory eligibility criteria for a program because the executive branch could always add new eligibility criteria—criteria that the legislature never considered—simply by asserting that such new criteria might relate to existing statutory criteria. Under that view, the legislature could never condition the expenditure of funds on the executive's strict compliance with the terms of a statute.

That cannot be. "'Administrative rules or regulations cannot amend or change legislative enactments.'" *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 19, 43 P.3d 4 (2002) (quoting *Dep't of Ecology v. Theodoratus*, 135 Wn.2d 582, 600, 957 P.2d 1241 (1998)). Neither can unpublished administrative policies and preferences.

The legislature's view is far more consistent with our precedent regarding the nature of appropriations bills. It argues that the fuel type condition does not substantively amend the grant eligibility criteria imposed by RCW 47.66.040(2) but "merely prohibits an administrative agency from adopting a new [criterion]." Resp. Br. at 33. We agree: the fuel type condition tells WSDOT how to carry out its functions under RCW 47.66.040(2) during the 2019-21 biennium. Like other traditional appropriation conditions, the fuel type condition "pertain[s] only to the administrative functions of government." *Blakeslee*, 85 Wash. at 272. It does not conflict with the plain text of RCW 47.66.040 or change the way WSDOT has

31

No. 98835-8

considered that statute's mandatory criteria for nearly 30 years. *Cf. Flanders*, 88 Wn.2d at 184-85, 189. Nor does it preclude WSDOT from rejecting grant applications for failure to meet air quality standards or due to insufficient energy efficiency. It provides only that WSDOT may not consider a new, extratextual factor when allocating multimodal transportation grants in the 2019-21 biennium.

The governor next addresses the second *Locke* consideration, whether the "duration" of the challenged condition necessarily "extends beyond the two-year time period of the budget." *Locke*, 139 Wn.2d at 147. He argues that the legislature's decision to include the fuel type condition in section 220(5)(a) "demonstrates an intent to extend beyond the current biennium."[14] Governor's Opening Br. at 42. And we have certainly held that a provision in an appropriations bill violates article II, section 19 when it "creates a rule of action, a segment of substantive law, to be effective far beyond the period of the biennium in which appropriations can constitutionally have effect." *Wash. Toll Bridge Auth.*, 54 Wn.2d at 551.

---

[14] The legislature argues that the governor waived argument on the second two *Locke* factors since he raised them only on appeal. Resp. Br. at 38, 40. The legislature is partially incorrect: the governor discussed the first *Locke* factor in his cross motion for summary judgment, CP at 87, and he discussed the first two *Locke* factors at the motion hearing. VRP at 19-20. As to the third factor, it is part of a constitutional issue that can be raised for the first time on appeal under RAP 2.5(a)(3). In addition, both parties briefed the third factor, so this court is well informed.

No. 98835-8

But the fuel type condition poses no such problems. First, as discussed above, the fuel type condition does not constitute "a segment of substantive law." *Id.*

The fuel type condition does not extend too far into the future, either. In *Washington Toll Bridge Authority*, an appropriations bill designated a new, permanent source of payment for bonds for a second Lake Washington bridge. But a different payment source for those bonds had already been specified in a preexisting substantive statute. *Id.* at 550. We held that the appropriation bill's new designation—which changed the payment source from that specified in the preexisting statute and which purported to change that payment source for "an indefinite period," permanently—violated article II, section 19. *Id*. But the governor points to no comparable language extending the fuel type condition beyond the biennium to which the $77,679,000 appropriation applies in this case. The condition is completely tied to agency decisions made during that time-limited biennium.[15]

---

[15] Section 220(5)(a) does contain the sentence, "Additionally, *when allocating funding for the 2021-2023 biennium*, no more than thirty percent of the total grant program may directly benefit or support one grantee." (Emphasis added.) The governor argues that this sentence attempts to direct activity beyond the biennium. Governor's Opening Br. at 43. But this condition addresses only actions by WSDOT *during* the 2019-21 biennium. Further, the governor did not assign error to this particular sentence; he argued only that the fuel type condition violated article II, section 19. *Id.* at 3.

33

No. 98835-8

Finally, the governor turns to the third *Locke* consideration and argues that the fuel type condition, "if effective, would define rights or eligibility for these grant programs." Governor's Opening Br. at 43. But as the legislature points out, *Locke*'s third substantive law factor is whether a provision "'define[s] rights or eligibility for *services*.'" Resp. Br. at 40 (quoting *Locke*, 139 Wn.2d at 147 (emphasis added)). That factor bars the legislature from enacting an appropriations bill that includes a substantive provision impacting individuals' rights to or eligibility for social assistance programs. *Locke*, 139 Wn.2d at 147 (copayment provision in appropriations bill "add[ed] restrictions to public assistance eligibility"); *Flanders*, 88 Wn.2d at 185 (appropriations provision defined eligibility for services where it created an age requirement that did not exist in the codified welfare statute). But the fuel type condition does not impact anyone's eligibility for "services"—it impacts an executive agency's grant allocation decision. Nor do the fuel type condition and the grant funding program create any "rights." *See Retired Pub. Emps. Council*, 148 Wn.2d at 631 (provision in appropriations bill changing state retirement system contribution rates was *not* substantive law because state employees "do not have specific pension rights in the physical system and individual statutes in effect when they began work"). And the fuel type condition does not "define" anything.

No. 98835-8

Thus, the fuel type condition does not "conflict with the general law as codified." *Flanders*, 88 Wn.2d at 191. It does not purport to create law that extends past the 2019-21 biennium. And it does not "define[] rights or eligibility for services." *Locke*, 139 Wn.2d at 147. While *Locke*'s "list of indicia of substantiveness is not exhaustive," the governor offers no other argument that the fuel type condition constitutes substantive law. *Retired Pub. Emps. Council*, 148 Wn.2d at 631.

We therefore conclude that the fuel type condition in ESHB 1160, section 220(1)(a), (b), (2), (3)(a), (5)(a), (7), and (9) complies with article II, section 19.

III.    THE FUEL TYPE CONDITION DOES NOT VIOLATE ARTICLE II, SECTION 37

Article II, section 37 provides, "No act shall ever be revised or amended by mere reference to its title, but the act revised or the section amended shall be set forth at full length." The governor argues that the fuel type condition violates this constitutional provision because it amends RCW 47.66.040 without setting forth that statute in full. Governor's Opening Br. at 45-46. We disagree.

Under the two-step framework we apply to article II, section 37 challenges, an enactment does not impermissibly revise or amend existing law if it (1) is a "complete act" and (2) does not "render[] erroneous" "a straightforward determination of the scope of rights or duties under the existing statutes." *Wash. Educ. Ass'n v. State*, 93 Wn.2d 37, 40-41, 604 P.2d 950 (1980) (*WEA* I) (citing

35

*Naccarato v. Sullivan*, 46 Wn.2d 67, 74, 278 P.2d 641 (1955); *Weyerhaeuser v. King County*, 91 Wn.2d 721, 731, 592 P.2d 1108 (1979)). The first step of this analysis "make[s] sure the effect of new legislation is clear." *El Centro de la Raza v. State*, 192 Wn.2d 103, 129, 428 P.3d 1143 (2018) (plurality opinion) (quoting *Amalg. Transit Union Local 587 v. State*, 142 Wn.2d 183, 245, 11 P.3d 762 (2000)). The second step ensures that readers need not conduct "a thorough search of existing laws" "in order to understand [the new provision's] effect on other provisions." *Id*. at 131-32.

Turning to the first inquiry, the fuel type condition is "complete in itself," *Amalg.*, 142 Wn.2d at 246, because "the scope of the rights or duties created or affected by the legislative action can be determined without referring to any other statute or enactment." *WEA* I, 93 Wn.2d at 40. The fuel type condition neither creates nor affects any rights. It does impose a duty on WSDOT to refrain from considering fuel type in the grant selection process for the grant programs to which it applies. But the scope of that duty is contained within the condition and "can be determined without referring to any other statute or enactment." *Id.*; *see also El Centro*, 192 Wn.2d at 129; *Citizens for Responsible Wildlife Mgmt. v. State*, 149 Wn.2d 622, 642, 71 P.3d 644 (2003) (*CRWM*); *State v. Manussier*, 129 Wn.2d 652, 663, 921 P.2d 473 (1996); *Wash. Educ. Ass'n v. State*, 97 Wn.2d 899, 903, 652 P.2d 1347 (1982) (*WEA* II); *Spokane Grain*, 59 Wash. at 82. Because the fuel type

No. 98835-8

condition is independent from, and not in conflict with, the mandatory considerations imposed by RCW 47.66.040, it is not necessary to "search out" that statute in order to understand the scope of the proscription against consideration of fuel type in the grant selection process for the 2019-21 biennium. *El Centro*, 192 Wn.2d at 131.

We turn next to the test's second prong: would "a straightforward determination of the scope of rights or duties under the existing statutes be rendered erroneous by the new enactment?" *WEA* I, 93 Wn.2d at 41 (citing *Weyerhauser*, 91 Wn.2d at 731). This second prong is often more difficult to apply, because while """[n]early every legislative act of a general nature changes or modifies some existing statute, either directly or by implication,'" that does not necessarily mean that the legislation is unconstitutional." *El Centro*, 192 Wn.2d at 128 (alteration in original) (quoting *CRWM*, 149 Wn.2d at 640 (quoting *Holzman v. City of Spokane*, 91 Wash. 418, 426, 157 P. 1086 (1916))). *See also WEA* II, 97 Wn.2d at 906 ("Undoubtedly, modification of existing laws by a complete statute renders the existing law by itself 'erroneous' in a certain sense."). Thus, the inquiry under this prong is more a matter of degree than an absolute. *CRWM*, 149 Wn.2d at 643 (explaining that a new enactment did not "alter preexisting rights or duties to an impermissible degree"); *WEA* II, 97 Wn.2d at 906 (explaining that the

37

degree to which a new enactment may have failed to disclose its effect on existing statutes was "not of constitutional magnitude").

We applied these principles in *Washington Education Association*. In that case, a "straightforward reading" of the existing substantive statutes indicated that school districts had "the power to spend funds, from whatever source, as they choose on teacher salaries." *WEA* I, 93 Wn.2d at 41. But a provision in a 1979 appropriations bill purported to bar school districts from increasing teacher salaries beyond specific limits "'from any fund source.'" *Id.* at 38 (quoting LAWS OF 1979, 1st Ex. Sess., ch. 270, § 100(1)). We concluded that the appropriations provisions rendered erroneous a straightforward understanding of the school districts' powers under the preexisting statutes. *Id.* at 40; *see also El Centro*, 192 Wn.2d at 130-31 (statute stating collective bargaining rights were granted "to 'any county or municipal corporation, or any political subdivision of the state of Washington,' except those covered by other collective bargaining laws" failed prong two of the test because it failed to set forth the "other" collective bargaining laws affected, thereby requiring "a thorough search of existing laws in order to understand the [Charter School] Act's effect on other provisions of chapter 41.56 RCW").

In contrast, the preexisting statute here lists several criteria that "shall be considered" by WSDOT "in selecting programs and projects" for funding from the multimodal transportation account. RCW 47.66.040(2). "Fuel type" is not among

No. 98835-8

them. A reader's straightforward understanding of the duties imposed by RCW 47.66.040 is not rendered erroneous by the fuel type condition because the fuel type condition does not alter the statute's criteria or conflict with them. To the extent that the fuel type condition remains silent on "how it relates to the rest of [RCW 47.66.040], [that silence is] . . . not of constitutional magnitude." *WEA* II, 97 Wn.2d at 906; *see also CRWM*, 149 Wn.2d at 643.

At most, the fuel type condition "supplements" RCW 47.66.040(2). The state constitution permits this: "[c]omplete acts" that "supplement prior acts or sections thereof without repealing them . . . are excepted from section 37." *CRWM*, 149 Wn.2d at 642 (citing *Naccarato*, 46 Wn.2d at 75); *Manussier*, 129 Wn.2d at 664-65. As discussed above, the mere possibility that fuel type might be one of numerous conceivable aspects of "energy efficiency issues" or "federal and state air quality requirements" does not transform fuel type into a mandatory criterion under the statute.

The goal of article II, section 37 is to "'protect the members of the legislature and the public against fraud and deception; not to trammel or hamper the legislature in the enactment of laws.'" *CRWM*, 149 Wn.2d at 640 (quoting *Spokane Grain*, 59 Wash. at 82). This goal is especially important in the appropriations bill context, considering the "must-pass" nature of such omnibus funding bills as well as the connection between appropriations bills and the

39

statutorily created programs they fund. *See Locke*, 139 Wn.2d at 147 n.6 (noting that "[a]n operating budget bill is essentially a compulsory outcome of any legislative session"); *Flanders*, 88 Wn.2d at 188. The fuel type condition complies with these goals. It is "complete in itself" and its only "impact on existing laws" is indirect: it bars WSDOT from considering a new, extrastatutory factor in making multimodal grant determinations during the 2019-21 biennium. *Amalg.*, 142 Wn.2d at 246.

We hold that the fuel type condition complies with article II, section 37.

CONCLUSION

This case requires the court to exercise two of our most fundamental duties: to "delineate and maintain the proper constitutional balance between the coordinate branches of our State government with respect to the veto" and, more broadly, to interpret the constitution faithfully. *Lowry*, 131 Wn.2d at 313; *Juvenile Dir.*, 87 Wn.2d at 241.

We hold that the Washington Legislature enacted the fuel type condition pursuant to its constitutional authority to appropriate funds and to control the expenditure of those funds. Governor Inslee exceeded his article III, section 12 veto power by striking the fuel type condition, which formed only one part of each appropriation item in which it appeared. Further, the fuel type condition does not constitute substantive law smuggled into a budget bill in violation of article II,

No. 98835-8

section 19; it is a valid legislative limit on an executive agency's expenditure of appropriated funds. And the fuel type condition does not amend any existing law without setting forth that law in full; it therefore complies with article II, section 37.

We affirm the superior court's orders on summary judgment in favor of the legislature.

_____
Gordon McCloud, J.

WE CONCUR:

_____
_____
Stephens, J.

_____
Johnson, J.

_____

_____
Madsen, J.

_____
Montoya-Lewis, J.

_____
Owens, J.

_____
Whitener, J.

*Washington State Legislature v. Inslee*, No. 98835-8
(Yu, J., dissenting)

No. 98835-8

YU, J. (dissenting) — It is our constitutional duty "to uphold both the power of the Legislature to write legislation as it may choose, and the power of the Governor to exercise the general and line item veto." *Wash. State Legislature v. Lowry*, 131 Wn.2d 309, 313, 931 P.2d 885 (1997). To fulfill this duty, we must address the most "difficult and controversial aspect of relations between our branches of government." *Id.* at 312. The holdings of *Lowry* did so, and did so correctly. But dicta from a footnote in *Lowry* made it necessary for the court to further refine its analysis of the governor's line item veto power in *Locke*. *Wash. State Legislature v. State*, 139 Wn.2d 129, 142, 985 P.2d 353 (1999) (*Locke*) (discussing "*Lowry*'s footnote 8," 131 Wn.2d at 323 n.8). Yet *Locke* preserved the explicit, constitutional distinction between the general veto power and the line item veto power, which the court had clearly recognized in *Lowry*. CONST. art. III, § 12.

We should continue this line of consistent adjudication in order to fulfill our "constitutional duty to act as an impartial referee of constitutional disputes between

1

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

the legislative and executive branches." *Lowry*, 131 Wn.2d at 330-31. Yet today, the majority erodes the distinction between general and line item vetoes by elevating dicta from a footnote in *Lowry* above our own disposition of that case. *See* majority at 12 & n.5, 13 & n.6 (quoting *Lowry*, 131 Wn.2d at 323 n.8). It does not acknowledge the significant shift in law effected by its analysis today.

I would continue to apply *Lowry*'s holdings, rather than its dicta. Therefore, I would uphold the governor's veto of the "fuel type condition" in section 220 of the 2019 transportation appropriations bill. *See* LAWS OF 2019, ch. 416, § 220(1)(a), (b), (2), (3)(a), (5)(a), (7), (9) ("***Fuel type may not be a factor in the grant selection process.***"), 201-02 (governor's partial veto message). The fuel type condition was a whole, "nondollar budget proviso[ ]" and thus an "appropriation item" subject to the governor's line item veto. *Lowry*, 131 Wn.2d at 325; CONST. art. III, § 12. Moreover, without the governor's veto, section 220 of the 2019 transportation appropriations bill would be unconstitutional because the fuel type condition violated article II, sections 19 and 37. I respectfully dissent.

## ANALYSIS

A.  The governor's veto of the fuel type condition was within his article III, section 12 power to veto appropriation items

Before a bill "becomes a law," it must be "presented to the governor," who may either "sign it" or "return it, with [their] objections" to the legislature. CONST.

*Washington State Legislature v. Inslee*, No. 98835-8
(Yu, J., dissenting)

art. III, § 12. The authority to return legislation with objections is commonly known as the governor's veto power. The veto power has existed, in some form, "since statehood." *Lowry*, 131 Wn.2d at 316.

The governor has both a "general veto power" (which allows the governor to veto "a whole bill or a section of a bill") and a "line item veto power," which "extends to 'appropriation items,'" even if they are "less than an entire section." *Id.* at 315-16; CONST. art. III, § 12. Our precedent has clarified that "appropriation items" include "budget provisos"—both "'dollar provisos'" (which "'condition[ ] the appropriation to an agency on compliance with legislative direction that certain funds be spent or not be spent'") and "'nondollar provisos'" (which "'make[ ] no reference to a specific dollar amount'"). *Locke*, 139 Wn.2d at 138 (quoting *Lowry*, 131 Wn.2d at 314). The governor's veto is subject to override by a two-thirds majority of the legislature, which may convene an "extraordinary session . . . solely to reconsider any bills vetoed." CONST. art. III, § 12.

In this case, the governor vetoed a single sentence, which appeared in multiple subsections of the 2019 transportation appropriations bill: "Fuel type may not be a factor in the grant selection process." LAWS OF 2019, ch. 416, § 220(1)(a), (b), (2), (3)(a), (5)(a), (7), (9) (boldface and italics omitted), 201. The legislature did not attempt to override the governor's veto, choosing instead to file this declaratory judgment action. The question is whether the fuel type condition

3

*Washington State Legislature v. Inslee*, No. 98835-8
(Yu, J., dissenting)

"comprised a whole 'appropriation item.'" Majority at 5 (quoting CONST. art. III, § 12). I would hold that it did, so the fuel type condition was properly subject to the governor's line item veto.

The majority reaches the opposite conclusion, asserting "that a veto of 'anything less than the *whole proviso*' is invalid," and that "we start with the presumption that a 'whole proviso' is equivalent to a 'full subsection[ ] of the section of an appropriations bill.'" *Id.* at 12-13 (alteration in original) (quoting *Lowry*, 131 Wn.2d at 323 n.8). These assertions distort *Lowry* to the point of implicitly disavowing it. In doing so, the majority shifts the careful balance between legislative and executive power set forth by our precedent.

1. The majority's purported clarification of *Lowry* is irreconcilable with *Lowry* itself

The majority's analysis in this case elevates dicta from a footnote in *Lowry* (footnote 8) above contrary holdings in the body of that opinion. The majority does this in a lengthy footnote of its own, which purports to "clarify" *Lowry*:

> The *Lowry* court made this statement [(that "we start with the presumption that a 'whole proviso' is equivalent to a 'full subsection[ ] of the section of an appropriations bill'")] in a footnote, which reads:
>
> > The budget provisos to which the Governor's line item veto extends include full provisos to an appropriations bill, that is, full subsections of the section of an appropriations bill. We do not believe an

4

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

> "appropriation[ ] item" may be a sentence, phrase, letter,
> digit, or anything less than the whole proviso.

> 131 Wn.2d at 323 n.8. We agree in full with the first sentence of the
> footnote. It must be noted, however, that there is some tension
> between the second sentence of the footnote and *Lowry*'s outcome.
> Specifically, the *Lowry* court upheld the veto of several single
> sentences. *Id.* at 314 & n.2. Most of those sentences were also "full
> subsections"—but one was not. *Id.* at 324 (upholding veto of single
> sentence contained within larger subsection). And the *Lowry* court
> referred to the single vetoed sentence that appeared within a larger
> paragraph of text as, itself, a "subsection." *Id.* We take this
> opportunity to clarify *Lowry* and emphasize that a sentence that is
> "less than [a] whole proviso" may not be vetoed as an appropriation
> item. *Id.* at 323 n.8.

*Id.* at 13 n.6 (some alterations in original). I cannot agree. *Lowry*'s footnote 8 is

not merely in "tension" with *Lowry*'s "outcome"—it is flatly contradicted by the

analysis in the body of the *Lowry* majority opinion. *Id.* Thus, by following

footnote 8's dicta, the majority implicitly disavows *Lowry*'s holdings.

As the majority acknowledges, *Lowry* upheld the governor's "veto of [a]

single sentence contained within [a] larger subsection." *Id.*; *Lowry*, 131 Wn.2d at

324-25 (considering LAWS OF 1994, 1st Spec. Sess., ch. 6, § 610(5)(a)). Yet

footnote 8, as applied by today's majority, would hold that such a veto was subject

to a "presumption" of invalidity, because a "sentence" that is not designated as a

"full subsection[ ]" is presumptively not a "whole proviso." Majority at 13; *Lowry*,

131 Wn.2d at 323 n.8. To overcome this presumption, the governor in *Lowry*

should have been required to show that "'[t]he Legislature's designation of a

section'" was "'obviously designed to circumvent the Governor's veto power.'"

Majority at 12 (alteration in original) (internal quotation marks omitted) (quoting

*Lowry*, 131 Wn.2d at 320).

But that is not what happened in *Lowry*. Instead, the court upheld the

governor's veto of a "single sentence contained within a larger subsection" without

even considering whether there was legislative circumvention, much less

determining that the governor had made such a showing. *Id.* at 13 n.5; *see Lowry*,

131 Wn.2d at 324-25. The reason for this apparent inconsistency is that in the

process of elevating *Lowry*'s footnote 8, the majority takes *Lowry*'s discussion of

legislative circumvention out of context.

As explained by *Lowry*, the governor's constitutional veto power has two

components: a "general veto authority over legislation and a *distinct* veto power

over 'appropriation items.'" 131 Wn.2d at 315 (emphasis added) (quoting CONST.

art. III, § 12). The general veto power applies only to "a whole bill or a section of

a bill." *Id.* at 315-16. By contrast, the "line item" veto power "*also* extends to

'appropriation items.'" *Id.* at 316 (emphasis added). "By its very specific

language, article III, section 12 envisions appropriation items as *something less*

*than an entire section* of an appropriations bill." *Id.* at 322 (emphasis added);

CONST. art. III, § 12 (governor "may not object to less than an entire section,

6

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

except that if the section contain one or more appropriation items [they] may object to any such appropriation item or items").

Thus, when *Lowry* stated that "[t]he Legislature's designation of a section is conclusive unless it is obviously designed to circumvent the Governor's veto power," it did so *only* in the context of the governor's general veto power, which allows the governor to veto whole sections. 131 Wn.2d at 320, 317-21. Legislative circumvention was simply not part of *Lowry*'s separate discussion of the line item veto power. *Id.* at 321-23. *Contra* majority at 11-14.

Maintaining the distinction between general and line item vetoes is an important feature of Washington law because a distinctive feature of our state's budget legislation is that "[t]he Legislature has not employed a true programmatic or line item budget." *Lowry*, 131 Wn.2d at 321. Instead, "[t]he Legislature has chosen to make general agency appropriations with provisos for policy or specific agency programs in budget bills, rather than setting out more specific programmatic appropriations where each program in the budget is found in a separate section of a budget bill." *Id.* at 321-22. Thus, *Lowry* did not simply commit an oversight when it confined its discussion of legislative circumvention to the general veto power. To the contrary, *Lowry* took a reasoned approach that recognized the distinct constitutional role of the governor's *line item* veto power:

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

> Because the purpose of the Governor's "line item" veto is to excise line items in appropriations bills, we should give effect to such a purpose.  The Legislature frustrates such a purpose, however, if it drafts budget bills as lump sum appropriations to agencies.  The only feature of modern legislative bill drafting in Washington that resembles the traditional budget line item is the budget proviso.
>
> Consequently, we hold that any budget proviso with a fiscal purpose contained in an omnibus appropriations bill is an "appropriations item" under article III, section 12.

*Id.* at 323.

This analysis was "our own disposition of the case" in *Lowry*, which should control over contrary dicta in a footnote that was "'unnecessary to decide the case.'"  *Johnson v. Wash. State Liquor & Cannabis Bd.*, 197 Wn.2d 605, 618, 486 P.3d 125 (2021) (internal quotation marks omitted) (quoting *In re Pers. Restraint of Domingo*, 155 Wn.2d 356, 366, 119 P.3d 816 (2005)).  Yet, without explanation, the majority chooses to follow the footnote.  This does not "clarify *Lowry*."  Majority at 13 n.6.  It defies *Lowry*, eroding the constitutional distinction between general vetoes and line item vetoes.

2.    The majority's reliance on the 62d Amendment and *Locke* is misplaced

In addition to *Lowry*'s footnote 8, the majority relies on the 62d Amendment and *Locke* to bolster its "deference to the legislature's formatting decisions" in the context of line item vetoes.  *Id.* at 11.  However, as *Lowry* explained,

*Washington State Legislature v. Inslee*, No. 98835-8
(Yu, J., dissenting)

> The intent of S.J.R. [(Senate Joint Resolution)] 140, enacted in 1974 as the 62nd Amendment to the Washington Constitution, was to restore the veto power of the Governor to what it was understood to be prior to [*State ex rel.*] *Ruoff* [*v. Rosellini*, 55 Wn.2d 554, 348 P.2d 971 (1960)]. Plainly, at that time, the Governor had a line item veto and *an "item" was something less than a full section* of a bill.

*Lowry*, 131 Wn.2d at 322 (emphasis added) (citation omitted) (citing SENATE

JOURNAL, 43d Leg., 3d Ex. Sess., at 89 (Wash. 1974)).

Thus, the 62d Amendment required greater deference to the legislature's

formatting choices in the context of the *general* veto power. However, *Lowry*

explicitly "reject[ed] the dissent's unconventional notion that the 62nd Amendment

repealed the Governor's *line item* veto." *Id.* (emphasis added). Instead, "[t]he

'check', as it has always been, will be the Legislature's two-thirds override."

*Wash. Fed'n of State Emps., AFL-CIO, Council 28 v. State*, 101 Wn.2d 536, 547,

682 P.2d 869 (1984). The legislature did not attempt an override here, but "these

constitutional arrangements are for the people to determine, not this court. If these

arrangements become unsatisfactory or subjected to abuse, the people are capable

of making desired changes." *Id.*

The majority's reliance on *Locke* is also misplaced because its

characterization of that case, like its characterization of *Lowry*, is inaccurate.

*Locke* did not eliminate *Lowry*'s distinction between general and line item vetoes,

9

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Washington State Legislature v. Inslee*, No. 98835-8
(Yu, J., dissenting)

as the majority suggests. *See* majority at 14 (citing *Locke*, 139 Wn.2d at 141).

In fact, *Locke* explained that

> *Lowry* directs that the Governor's line item veto power is limited to "whole provisos." The issue then becomes what is a whole proviso? *Lowry's footnote 8, although commenting on the issue, does not adequately answer the question as designating a "full subsection" can be too easily manipulated* by the mere placement of a number or letter, or artificial division into paragraphs.

139 Wn.2d at 142 (emphasis added) (citation omitted). Thus, *Locke* reaffirmed

*Lowry*'s holdings (rather than its footnote 8 dicta) by recognizing that "the

Governor's line item veto power extends to whole provisos, but the parameters of

such provisos are *not* necessarily determined by artificial divisions by number or

letter; rather, an examination of the language in question and the operative effect of

such language indicates the nature of the proviso." *Id.* at 143 (emphasis added).

Given this context, the majority is simply wrong in its claim that *Locke* held

"only an *obvious* attempt to circumvent the veto power will overcome deference to

the legislature's designation of the scope of a whole appropriation item." Majority

at 14 (emphasis added). To the contrary, *Locke* itself "disregard[ed] deferring to

the Legislature's designation of [the relevant language] as a single and complete

'subsection,'" noting a "*specter* of circumvention" but relying on "the practical

impact" of the language. 139 Wn.2d at 141 (emphasis added). To do otherwise

"would encourage legislators to weave substantive policy provisions and fiscal

10

*Washington State Legislature v. Inslee*, No. 98835-8
(Yu, J., dissenting)

measures into appropriations bills, thereby legitimizing Byzantine bill drafting in appropriations measures." *Lowry*, 131 Wn.2d at 329.

If the majority believes that *Lowry*, as refined by *Locke*, is so incorrect and harmful "that it *must* be rejected, despite the many benefits of adhering to precedent," then it should do so explicitly, consistent with principles of stare decisis. *State v. Otton*, 185 Wn.2d 673, 678, 374 P.3d 1108 (2016). However, I do not believe that *Lowry* and *Locke* are incorrect or harmful. Instead, I believe that they are well-reasoned decisions whose proper application has been hindered by one confusing, contradictory statement of dicta confined to a single footnote. Therefore, I would continue to apply *Lowry*'s and *Locke*'s holdings. I would also take this opportunity to make it clear that footnote 8 to the *Lowry* majority opinion contains misleading dicta, not controlling precedent.

2.     The governor acted within his line item veto power to veto the fuel type condition because it was a whole, nondollar budget proviso

Based on the foregoing, I would hold that the governor did not exceed the scope of his line item veto power when he vetoed the fuel type condition.

The line item veto extends to any "appropriation item." CONST. art. III, § 12. We do not presume that an appropriation item is the same as a legislatively designated subsection if the "practical impact" of the language in question is that of a budget proviso. *Locke*, 139 Wn.2d at 141. A budget proviso, in turn, is

"'language conditioning how an agency may spend an appropriation.'" *Id.* at 138 (quoting *Lowry*, 131 Wn.2d at 314). If the proviso "'makes no reference to a specific dollar amount,'" then it is a "'nondollar'" proviso, but it is still an appropriation item. *Id.* (quoting *Lowry*, 131 Wn.2d at 314).

In my view, the fuel type condition is *not* merely part of a larger proviso that "relates directly to the appropriation amount that begins each subsection of section 220 in which the condition appears." *Contra* majority at 23. Instead, its restriction on the grant selection criteria operates as "a discrete condition from the restriction that funds be used solely for certain grant programs and projects, even though they appear in the same subsection and may be tangentially related." Governor's Reply Br. at 12.

Therefore, I would hold that in language and operative effect, the fuel type condition stands alone as a whole, nondollar budget proviso. Thus, it was within the governor's constitutional power to veto it.

B.     The fuel type condition violated article II, sections 19 and 37

Because I would resolve this case on the basis of the veto power, as discussed above, I would not reach the question of whether the fuel type condition, if not vetoed, would be constitutional. However, I must briefly express my disagreement with the majority's analysis of the governor's article II challenges to the fuel type condition.

12

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

1. The fuel type condition violated article II, section 19 because it purported to amend substantive law in an appropriations bill

As the majority correctly recognizes, in accordance with article II, section 19 of the state constitution, "[a]n appropriations bill which 'defines no rights' certainly cannot abolish or amend existing law." *Flanders v. Morris*, 88 Wn.2d 183, 188, 558 P.2d 769 (1977); *see* majority at 26-27. It is apparent to me that the fuel type condition at issue here was an improper attempt to do just that with respect to RCW 47.66.040(2).

RCW 47.66.040(2) sets forth baseline criteria that the Department of Transportation "shall" consider "in selecting programs and projects," including "federal and state air quality requirements" and "energy efficiency issues." In modern transportation, fuel type is so intertwined with both of those considerations that the fuel type condition would have "precluded consideration of an important component of air quality and energy efficiency that the [Public Transportation] Division is otherwise required to consider." Governor's Opening Br. at 41.

Yet the majority interprets RCW 47.66.040(2) not in accordance with the legislature's intent as expressed by the statute's plain language but, instead, in accordance with the state of hybrid car technology from almost 30 years ago. *See* majority at 30 & n.13. I cannot join in this analysis. If it were necessary to do so, I would hold that the fuel type condition violated article II, section 19.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

    2.       The fuel type condition violated article II, section 37 by amending RCW 47.66.040 without so much as referencing it

Finally, article II, section 37 provides, "No act shall ever be revised or amended by mere reference to its title, but the act revised or the section amended shall be set forth at full length." The fuel type condition clearly violated this provision with respect to RCW 47.66.040.

First, it is not possible to determine "the rights or duties under the statute . . . without referring to another statute." *Black v. Cent. Puget Sound Reg'l Transit Auth.*, 195 Wn.2d 198, 205, 457 P.3d 453 (2020). Instead, a person reading the fuel type condition would also need to independently know about, locate, and read through RCW 47.66.040 to discover which criteria are permitted or required in the grant selection process.

Moreover, "'a straightforward determination of the scope of rights or duties under the existing statutes [would] be rendered erroneous by'" the fuel type condition. *Id.* (alteration in original) (internal quotation marks omitted) (quoting *El Centro de la Raza v. State*, 192 Wn.2d 103, 129, 428 P.3d 1143 (2018) (plurality opinion)). Any person who is aware of modern transportation technology would certainly conclude that RCW 47.66.040(2) permits (perhaps even requires) the Department of Transportation to consider fuel type in order to

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

fulfill its duty to consider energy efficiency and air quality issues. The fuel type condition would render this plain reading of RCW 47.66.040 erroneous.

Thus, if it were necessary to reach the governor's article II challenges to the fuel type conditions, I would hold that the fuel type condition violated both section 19 and section 37.

CONCLUSION

"We should be steadfast in exerting a limited, and cautiously exercised, judicial responsibility with respect to the veto power to make sure neither the Legislature nor the Governor takes unfair advantage, and the balance our constitution envisions endures." *Lowry*, 131 Wn.2d at 331. Therefore, we should be consistent in our adjudication, and when we must reject our precedent, we should do so openly and explain why we are doing it. Today, I believe the majority shifts the balance of power too far in favor of the legislature, and it does so in a footnote based on dicta from another footnote.

In accordance with the holdings of *Lowry* and *Locke*, as well as the plain language of article III, section 12, I would reverse the trial court and hold that the governor's veto of the fuel type condition here was a valid exercise of the constitutional line item veto power. Thus, I respectfully dissent.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Washington State Legislature v. Inslee*, No. 98835-8
(Yu, J., dissenting)

_____
Yu, J.

_____
González, C.J.

16